Greeta K. BROWN, Appellant,

v.

William WOOD et al., Appellees.

William WOOD et al., Cross-Appellants,

v.

Greeta K. BROWN, Cross-Appellee.

Nos. 2564 and 2565.

Supreme Court of Alaska.

Jan. 27, 1978.

Max F. Gruenberg, Jr., Anchorage, for appellant.

Floyd V. Smith, Hagans, Smith and Brown, Anchorage, for appellees.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

## OPINION

BURKE, Justice.

In October, 1973, Greeta Brown filed suit in superior court against the University of Alaska and several of its officials and employees, charging that officials of the University had discriminated against her on the basis of her sex in their determination of her salary and promotions. Trial was had in December, 1974, following which the court, sitting without a jury, found for the defendants. Brown's appeal of that decision presents several issues in the area of sex discrimination which have not before been addressed by this court.[1]

Appellant Greeta Brown was hired in 1965 as an Assistant Professor of Music by the University of Alaska. Her employment was on the Fairbanks campus. Her starting salary was $1000 per month. In the same year, three men were also hired as Assistant Professors of Music; two, Duane Mikow and Jean Paul Billaud, received starting salaries of $1150 per month, and the third, Rubin Decker, was paid $1350 per month. Mikow and Brown had Master's Degrees and both had completed a portion of the requirements for a doctorate before being hired by the University. Brown had taught previously at the high school and college levels, including Juneau's Community College, before employment with the University, while Mikow had spent the years between 1955 and 1964 as band director at the junior high and high school levels. Billaud was a self-employed concert artist and teacher in Europe and had performed with several symphony orchestras before coming to the University.

Although Rubin Decker left the University of Alaska in 1967, Mikow, Billaud and Brown remained in the music department, and from their first year in 1965 until shortly before Brown tendered her resignation in 1973, the two men were always paid more than Ms. Brown.[2] Her primary claim

1. Appellees filed a cross-appeal contesting the trial court's failure to award them attorney's fees. This issue was not briefed, however, and thus will be considered abandoned for failure to conform with Appellate Rule 11. *See e. g., Haskins v. Shelden,* 558 P.2d 487, 491 n.1 (Alaska 1976); *Miller v. City of Fairbanks,* 509 P.2d 826, 829 (Alaska 1973).

2. Following is a table which shows the respective salaries and titles of Decker, Mikow, Billaud and Brown for the years 1965–1973.

at trial was that the University thus discriminated against her in salary matters based on her sex.

In addition to her claim that she was paid less, Brown contended that she was promoted more slowly than her male counterparts. Brown, Mikow, and Billaud were all promoted to Associate Professor in 1968–69. The record reveals that although she was the only University professor statewide to hold a doctorate in Music from 1970–73, and that a doctorate was theoretically required for full professors, she taught in the music department for eight years before being promoted to full professor. Charles Davis, who was hired two years prior to Mikow, Billaud, and Brown, was the other tenured member of the music department. He was promoted to full professor after six years of teaching at the University. Billaud was promoted to full professor after five years at the University. Mikow had not been promoted to full professor at the time Brown left.

The third area in which appellant Brown claimed discrimination was her teaching load as compared to that of the male professors. She introduced evidence showing that she taught more courses and worked more overtime hours than Davis, Mikow or Billaud.

At trial, University officials did not contest the fact that Dr. Brown's monthly salary was lower than that of her male colleagues, but they denied that this was a result of sex-discrimination. With regard to the discrepancy in the starting salaries of Brown, Mikow, Billaud and Decker, defendant-appellee Charles Davis, head of the music department, testified that he and Ms. Brown had conducted preliminary negotiations for the position of assistant professor but that no firm commitment or contract for the job had ever been made. Although the legislature cut the funding for the position, Davis never notified Brown, and she arrived on the Fairbanks campus in the fall of 1965, thinking that she had a position. Officials of the University, apparently feel-

|  | Decker | Mikow | Billaud | Brown |
|---|---|---|---|---|
| 1965–66 | Ass't 1350 | Ass't 1150 | Ass't 1150 | Ass't 1000 |
| 1966–67 | 1350 (+0) | 1275 (+125) | 1275 (+125) | 1075 (+75) |
| 1967–68 |  | 1400 (+125) | 1400 (+125) | 1175 (+100) |
| 1968–69 |  | Assoc. 1525 (+125) | Assoc. 1525 (+125) | Assoc. 1425 (+250) |
| 1969–70 |  | 1625 (+100) | 1625 (+100) | 1550 (+125) |
| 1970–71 |  | 1900 (+275) | Full Prof. 2100 (+475) | Sabbatical * |
| 1971–72 |  | 1900 (+0)** | 2100 (+0)** | 1800 (+250) |
| 1972–73 |  | Sabbatical | 2150 (+50) | 1925 (+125) |
| 1973–74 |  |  |  | Promoted to Full Prof. |

\* No salary increases were given during Sabbatical years.

\*\* Mikow and Billaud told Brown that they voluntarily gave up their salary raises in . 1971–72 so that she could have a substantial raise.

ing that they were to blame for the misunderstanding, drew funds from other areas so that Greeta Brown could be employed as assistant professor at $9,000 per year. However, the original position which had been tentatively offered to Ms. Brown was also funded at $9,000 per year, although the evidence showed that this position had not been slated as a female position.

As justification for the continuing discrepancy in salaries, the University explained its policies with regard to salaries, promotions and overtime. In the area of salaries, Dr. Donald Theophilus, Vice President of Academic Affairs for the University, and one of the defendants in the action, testified that the president of the University made salary determinations, and that although the president looked primarily to the department head's evaluation of the professor, the decision-making process provided a "great deal of leeway for administrative judgment." Theophilus stated that the following variables were considered in determining salaries: (1) the department head's evaluation and recommendation—the chief criterion; (2) the amount of funding allocated by the legislature; (3) a process called "catch up", i. e., if a professor's salary was lower than the salaries of other professors of the same rank, "this might be taken into consideration to try to catch up"; and (4) Professional Career Salary Patterns which set out the salary range for each teaching rank.

Greeta Brown's performance evaluations were introduced at trial. A close analysis of the ratings she received each year and the corresponding salary increments demonstrate that these evaluations had little to do with her salary increases. In the first two years of teaching, she received excellent evaluations, but her salary increases were smaller than those of Mikow and Billaud. After 1967–68, all three were promoted to associate professor. Brown received another favorable rating, recommending her promotion and "a merit increase commensurate with that advancement in rank." Billaud and Mikow were given $125 raises to $1525 per month; Brown was raised $250 to $1425 per month. In 1968, Mikow was promoted

to department head, and in the three years subsequent he gave Ms. Brown only average ratings; yet during that period her salary increases were higher than those of the two males.

According to Dr. Theophilus, legislative allotments and "catch up" were two other factors which played a role in determining Brown's salary. The discrepancy in salaries after 1970 was caused in part by Dr. Brown's decision to take a sabbatical leave in 1970–71. Her salary remained frozen, while Mikow and Billaud received increases of $275 and $475 respectively. Dr. Theophilus explained that these unusually high increases in the year that Brown was away were due to a large funding allotment from the legislature. The following year, Ms. Brown was given a large raise despite an average evaluation, the purpose apparently being to bring her salary to a level commensurate with that of other associate professors. However, her salary was still not brought to the same level as that of Billaud or Mikow.

With regard to promotions, Theophilus admitted that Billaud's promotion to Full Professor after just five years of teaching was unusual, calling Billaud a "studded light in the University's relationship with the community." He explained that Charles Davis had been promoted after six years because he was a tenured professor at another university for four years. He also pointed to the fact that Brown had been promoted ahead of Mikow. Finally, he stated that all members of the department worked long overtime hours and none were compensated for it.

Brown testified that she first realized that her salary was lower than that of the men in her department in 1968. She went to the Dean of the College of Arts and Letters, Charles Keim, and he admitted that there was a discrepancy, stating that he would "rectify that immediately." She further testified that in 1971, she complained to Keim's successor, Dean Mueller, that she was unhappy about being paid a lower salary than the men and that he told

her that "getting the women's salaries in the College of Arts and Letters in line with men's salaries was his top priority." She complained again to Dr. Theophilus in 1972, and he referred to a document called the "distaff sheet" which indicated that on an average, women were paid less than men in the University. He stated that he was trying to remedy the discrepancy.

Brown attempted to introduce at trial other evidence of discrepancies between men's and women's salaries throughout the music department. Although some of this material did find its way in through the back door, in a defense exhibit which listed all salaries of music department employees from 1965–73, as well as those in other departments, the trial court refused to consider this data, holding it to be irrelevant:

> I will sustain your objection to the extent that I'm not going to let her go into the fact that other people may receive less or more, whether they are men or women, but if it is relevant to—if it is in comparison with her salary to someone else, I will let it in, but not the mere fact that other comparisons, which she is not a party to comparison, I won't let it in.[3]

In 1973, Dr. Brown resigned from the University after she could not secure a transfer to the Anchorage campus.

Prior to the commencement of trial, the court ruled on several preliminary matters. It first held that the University could not be sued under 42 U.S.C. § 1983 (Civil Rights Act of 1871), holding that it was a state agency and as such was immune from suit. It next held that Brown's status at the University was not an "occupation" under AS 23.10.155 (Alaska's Equal Pay for Women Act) and thus it could not be sued under that statute. Finally, he held that a two-year statute of limitations would apply to the case and that if discrimination were found, Brown would only be entitled to two years of back pay.

At the conclusion of the trial, the court rendered an extensive oral decision in the case and also issued written findings of fact and conclusions of law. In its oral decision, the court found that Brown had been hired at a lower starting salary than Mikow or Billaud and that she was as qualified for the position as the men. It held that Brown had established a prima facie case of discrimination by demonstrating that she had been paid $1000 per month, the lowest possible starting salary for an assistant professor while men in like positions were paid $1150, but held that the University met its burden of proving that the salary differential was not based on Brown's sex.

With regard to the University's failure to correct the initial salary disparity over the following eight years, the court again found that Ms. Brown's qualifications and performance were "at least equal to or greater than all the other parties across the board." Although it is not clear, the court appeared to find that Brown had made a prima facie case of discrimination by showing that she was consistently paid less than males in her department. However, noting that she was given high raises near the end of her tenure and that the salary decisions were within the general guidelines established within the University, the court gave "great credit to the administrative expertise of the University in this case" and found a "lack of evidence produced here in court to show any such discrimination." The court further found that no pattern of discrimination was established as to promotions or workload.

Brown appeals the court's decisions on the jurisdictional matters, its allocation of the burden of proof and its refusal to consider evidence of a pattern of discrimination within the music department and throughout the University. She also contests the court's determination regarding the statute of limitations as it relates to an award of back pay.

---

**3.** Defense Exhibit "MM" indicates that women were paid lower starting salaries throughout the music department. Thus, for example, in 1969–70, three assistant professors were hired, two male and one female. Gordon Wright, who had a Masters Degree, was started at a salary of $1,350 per month, and Philip Brink was started at $1,250 per month. Nan Orthman, who was finishing her doctorate, was given a starting salary of $1,150.

■ Appellant's first contention on appeal is that the trial court erred in holding that the University was immune from suit under 42 U.S.C. § 1983 and that the University was exempted from coverage under AS 23.10.155, the Equal Pay for Women Act. In addition, appellant claims that the University may be sued under the Alaska Human Rights Act, AS 18.80, and under AS 14.40.050, which prohibits the University from discriminating on the basis of sex, color or nationality. However, because these latter statutes were not included in appellant's complaint, were not briefed or argued at trial, and were not the subject of any ruling by the superior court, we will not now consider these statutory theories of recovery. *See Saxton v. Splettstoezer*, 557 P.2d 1126, 1127 (Alaska 1976) and the cases cited therein. The issue, therefore, is whether appellant may recover against the University under 42 U.S.C. § 1983 or AS 23.10.155.[4]

42 U.S.C. § 1983, popularly known as the Civil Rights Act of 1871, provides in pertinent part:

Every person who, under color of any statute . . . custom, or usage, of any State . . . causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the United States Supreme Court held that municipalities are not "persons" under § 1983 and thus are not subject to suit. This immunity has subsequently been extended to states and their political subdivisions. *Williford v. California*, 352 F.2d 474 (9th Cir. 1965). The question here is whether the state university is likewise immune.

■ We find our ruling in *University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121 (Alaska 1975), to be dispositive of this issue. In that case we held that the University of Alaska did not have the right to a trial by jury because it was an "instrumentality of the state," and therefore could only be tried by a court without a jury under the former AS 09.50.290. We noted,

There is . . . sound authority for the proposition that even where created as a corporate entity, a state university, because of its relation to the state, is a mere agent or instrumentality of the state to carry out its public purpose. [footnote omitted].

536 P.2d at 126. Thus, because the University is in essence a branch of the state government, it follows that it is not a "person" which may be held liable in a suit under 42 U.S.C. § 1983.[5] The superior court did not err in so finding.[6]

4. In her complaint, appellant also sought recovery under 42 U.S.C. § 1985(3). However, no evidence of conspiracy under this statute was introduced at trial, nor was this cause of action briefed or argued at trial. Brown also sought to recover directly under the Fourteenth Amendment to the United States Constitution and Art. I, section 3 of the Alaska Constitution. The superior court apparently felt that it had jurisdiction over the action under these constitutional provisions, for it rejected 42 U.S.C. § 1983 and AS 23.10.155 as bases for jurisdiction. We will not, however, need to reach the issue of whether a direct action for damages may be brought under the Alaska or United States Constitutions.

5. In *Wolfe v. O'Neill*, 336 F.Supp. 1255 (D. Alaska 1972), the district court held that the University of Alaska was a "person" and thus subject to jurisdiction under § 1983. The court based its reasoning on the fact that the plaintiff

was only seeking equitable relief against the University. This reasoning has been subsequently rendered invalid under *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), in which it was held that municipalities (and, therefore, by extension, other government entities) are always immune from suit under § 1983, regardless of the form of relief sought. The court in *Wolfe* also noted in a footnote that the University is a corporation which can sue and be sued in its own name as further justification for its finding of jurisdiction. However, our decision in National Aircraft Leasing, *supra*, implicitly rejects this basis of jurisdiction.

6. Neither party to this appeal has briefed the question of whether the University officials are likewise immune from suit if the University itself is immune. For this reason (see footnote 1, *supra*) and because it is not necessary for us to reach this issue, we do not decide whether

With regard to AS 23.10.155, the Equal Pay for Women Act, however, we find that the lower court erred in holding that the University was not covered by that Act. AS 23.10.155 provides:

> No employer may discriminate in the payment of wages as between the sexes, nor may he employ a female in an occupation in this state at a salary or wage rate less than the rate paid to a male employee for work of comparable character or work in the same operations, business, or type of work in the same locality.

■ We think it clear that the University is an "employer" as that term is used in the statute. Although it is somewhat more problematical, we also hold that appellant was employed in an "occupation" within the meaning of the statute. According to AS 23.10.185(4):

> 'occupation' includes an industry, trade, business or branch of industry, trade, business or branch, or any employment or class of employment in the industry, trade, business or branch.[7]

First, we note that the term occupation "*includes* an industry, trade, business or branch . . ." (emphasis added). The definition, thus, does not state that only working in an industry, trade or business constitutes an occupation, but merely indicates that among the activities which constitute an occupation are those in an industry, trade or business.

■ We feel, moreover, that the University of Alaska is in fact a "business" within this definition. Although it is a nonprofit corporation, the University has a similar function and bears s similar relation to society and its employees as a profit-making institution. Like any commercial business, the function and goal of the University is to provide something of value to the community, "i. e." education. The University receives compensation for providing this service and it seeks to reach and please the consumer public just as does a business for profit. Its employees perform the same tasks and enter into employment with the University with the same expectations of earning a livelihood as they would in an enterprise for profit. We are unable to see any meaningful distinction between a nonprofit educational institution and a profit-making institution such that one may discriminate in the payment of wages on the basis of sex while the other may not. Had the legislature meant to exempt the University from an obligation to pay equal wages to men and women for comparable work it could have done so expressly. However, we are not willing to read a specific exclusion into a provision as important as the instant one when the legislature has not seen fit to do so.[8] Accordingly, we hold that AS 23.10.155 prohibits the University of Alaska from discrimination in the payment of wages on the basis of sex.

---

these officials are immune from suit under § 1983.

7. AS 23.10.185(4) was amended slightly in 1974, after the filing of this suit.

8. Appellees argue that a legislative intent to exclude the University from coverage under AS 23.10.155 can be determined from examination of other laws pertaining to sex-discrimination. Thus, they emphasize that part of the Human Rights Act, which, among other things, prohibits sex-based wage discrimination in language identical to that in AS 23.10.155, does not apply to non-profit educational institutions. AS 18.-80.220(5); AS 18.80.300(3). In addition, they point out that AS 23.10.050–150, the Alaska Wage and Hour Act, does not apply to the state or its political subdivisions. From this, appellees argue that the legislature could not have intended to exclude the University from wage provisions in these two statutes, yet have meant to include it under the Equal Pay for Women Act. This argument is unpersuasive. First, the fact that the Human Rights Act prohibits wage discrimination using the same language as the Equal Rights for Women Act, yet excludes non-profit educational institutions, could support an inference opposite to that which appellees ask us to make: that is, that the legislature specifically immunized schools in one statute but not the other because it intended the provisions to have different scopes. Second, the Wage and Hour Act is directed toward a situation distinct from that of the Equal Pay for Women Act. Finally, we note that were we to look to other statutes for guidance as to legislative intent, we could as easily look to AS 14.40.050, which prohibits discrimination by the University on the basis of sex, color and nationality, and AS 18.80.255(1), which prohibits the state and its subdivisions from such discrimination.

Appellant also contends that the trial court applied the wrong standard of proof under her various theories of recovery. In its oral opinion, the trial court articulated the standard of proof as follows: "[T]he burden initially is placed upon the plaintiff to show that there is on the face an apparent discrimination, then the burden shifts." At another point, he further enunciated this standard by stating that once the plaintiff made a showing of facial discrimination, the University then had the burden of explaining its actions.[9]

■ Brown argues that the language of AS 23.10.155, the equal pay statute, makes it unlawful to employ a woman at a lower rate than a man when both are doing comparable work—regardless of the reason for such a discrepancy or any intent to discriminate. She bases her argument on the fact that the second clause of the statute is preceded by the disjunctive "nor" and when read independently of the first phrase, merely requires a plaintiff to prove that she was paid less than a man doing comparable work. We do not agree. The clear purpose of the statute is to prohibit sex-based wage discrimination, not to render any wage differential as between the sexes illegal per se. The legislature could not have intended that women be paid the same wages as men doing comparable jobs regardless of non-sex-based considerations such as merit or seniority. We will not construe the statute to produce such unreasonable results.

■ While AS 23.10.155 necessarily allows an employer to provide non-discriminatory justification for salary discrepancies between women and men performing comparable work, there is still a question as to how the burden operates in cases brought under it. The statute is silent on this question. In *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), the United States Supreme Court was faced with a similar problem with regard to the federal Equal Pay Act, 29 U.S.C. § 206(d).[10] That Act, although it does provide for specific defenses by the employer, is also silent as to the burden of proof. The Court held, however, that once a plaintiff in an action under the federal Act has shown that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden is on the employer to show that the differential is justified under one of the Act's defenses. 417 U.S. at 196, 94 S.Ct. 2223. We see no reason not to apply this same standard to the Alaska equal pay statute and therefore hold that under AS 23.10.155, once appellant made a prima facie showing that her salary was lower than that of men doing comparable work, the University then had the burden of going forward with evidence showing that the discrepancy was based on factors other than sex.[11]

9. We find that under any standard of proof, appellant has not shown that the University discriminated against her in promotions or workload. The only issues here, therefore, involve salary matters and AS 23.10.155.

10. 29 U.S.C. § 206(d)(1) provides:
No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. [original emphasis].

11. We would add, moreover, that the University also had the burden of proving by clear and convincing evidence that the salary discrepancy was based on factors other than sex. *See Brennan v. Owensboro-Daviess Cty. Hosp., Etc.*, 523 F.2d 1013, 1031 (6th Cir. 1975).

Applying this standard, the superior court properly found[12] that Brown had made a prima facie case of wage discrimination when she showed that her salary was consistently lower than men in her department doing comparable work. The court erred, however, in finding that the University had adequately justified the discrepancy between Brown's salary and that of her male counterparts in the music department. With regard to the initial salary discrepancy, the trial court was persuaded by the University's explanation that it could not get funding for the original position offered to Brown and that it drained other resources to create the position for her at $9,000 per year. This explanation is simply too tenuous in light of the fact that the legislatively-funded position originally offered to Brown was also only for $9,000. However, because this original position was not slated as a female position, the initial salary discrepancy does not, standing alone, indicate discrimination.

With regard to the continuing salary discrepancies for the years 1966 until the time Brown resigned in 1973, however, the University provided little exculpatory explanation. The trial court found no discrimination on the ground that salary increases for each professor were made individually within non-discriminatory guidelines and that administrative discretion and expertise in the matter were to be given great weight.

Although administrators have the right to make discretionary decisions regarding salaries and to consider factors other than sex in arriving at such decisions, administrative discretion does not in itself justify salary discrepancies as between the sexes. There must be some showing by those faced with evidence of unequal salaries that factors other than sex in fact explain the discrepancy. Such a showing has not been made in this case. Dr. Theophilus testified that three major factors went into salary determinations: performance evaluations, "catch up", and legislative funding. As discussed above, Brown's performance evaluations appeared to have no direct bearing on her salary raises. In those years when she received excellent ratings, her salary increases were less than those of her male colleagues, while her increases were greater than the men's in those years when her ratings were less enthusiastic. Although "catch up" was apparently used in 1971–72, resulting in a $250.00 per month raise, Brown's salary was still not brought to the level of the men. Finally, although the men received steep salary increases in 1970–71 because of large legislative appropriations (Brown was on sabbatical that year), there is no evidence that legislative funding prevented the University from bringing Brown's salary on a par with the men's at some point in the course of her employment.

Because the University has not provided a satisfactory explanation as to why appellant's salary was consistently lower than those of her male colleagues, we find that her prima facie showing of discrimination against her in the payment of wages stands unrebutted. Accordingly, we hold that Brown may recover against the University for discrimination in the payment of wages under AS 23.10.155.

Two further issues remain in the case. During the trial, appellant attempted to present evidence of other salaries received by women in the music department and throughout the University. This evidence was offered for the purpose of showing that a pattern of discrimination existed at the University in that women were generally paid less than men. In response to a defense objection, the trial court ruled that since Brown was not maintaining a class action, such evidence was irrelevant.

In making its ruling the trial court relied on the Fifth Circuit's decision in *Green v. Board of Regents of Texas Tech University*, 474 F.2d 594 (5th Cir. 1973), in which a woman professor challenged the University's refusal to promote her. The court held

---

12. As noted above, it is not clear from his oral decision whether the trial judge found that Brown had made a prima facie showing of wage discrimination with regard to the continuing salary discrepancy. We will assume, however, that he did.

that absent a class action, the trial court did not have to determine whether the University discriminated against women as a class, but only had to decide whether the evidence, statistical and otherwise, showed discrimination against the plaintiff.

We do not find *Green* dispositive in the instant case for we view the United States Supreme Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as enunciating a different rule. In that case, a corporation had refused to rehire a black man who had been laid off. In response to charges of racial motivation,[13] the corporation claimed that it had refused to rehire him because of his involvement in illegal activities to block access to the corporation. The Court found that the plaintiff had made a prima facie showing of discrimination but that the employer's explanation was sufficient to discharge its burden of rebuttal. However, the Court then remanded the case on the ground that the plaintiff had to be afforded an opportunity to show that the employer's stated reason for rejecting him was in fact a pretext.

The Court then went on to give guidance to the lower court as to the types of evidence which might indicate that the employer's stated reason was a pretext:

> Other evidence that may be relevant to any showing of pretext includes . . . petitioner's general policy and practice with respect to minority employment. On [this] point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks. [footnote omitted].

411 U.S. at 804–05, 93 S.Ct. at 1825. The Court noted, however, that general determinations of discriminatory practice could not

themselves be controlling as to a particular individual, particularly where the action in question was otherwise justifiable. *Id.* at 805, n. 19, 93 S.Ct. 1817.

We read *McDonnell* as holding that in cases involving alleged employment discrimination, a plaintiff must be allowed to furnish evidence not only that the employer discriminated against him or her, but also that there exists a pattern of similar discrimination by the employer. Such evidence of a discriminatory pattern is not to be considered as part of the plaintiff's prima facie case, but is to be viewed as evidence that the non-discriminatory justification given by the defendant is in fact a pretext. In the instant case, the University's failure to meet its burden of justification with regard to Brown has rendered unnecessary any evidence of its general discrimination against women. However, in the course of trial Brown could not have known that rebuttal by her would be unnecessary and thus she should have been given the opportunity to show that a pattern of sex-based wage discrimination in her own department and throughout the University existed.

Appellant's final argument concerns the trial court's ruling on damages. At the beginning of the trial, Judge Moody applied the two year limitation of actions contained in AS 09.10.070(3), which states in pertinent part, "No person may bring an action . . . (3) upon a liability created by statute, other than a penalty or forfeiture; unless commenced within two years." In so doing, he limited any recovery of back pay to that earned within two years prior to the institution of the suit. Thus he held that if appellant prevailed on her claim, she would only be allowed to recover for the period between October, 1971 and October, 1973, the time the suit was filed. *Cf. Marlowe v. Fisher Body*, 489 F.2d 1057, 1063 (6th Cir. 1973).

---

**13.** The plaintiff in *McDonnell* brought his action under certain provisions of Title VII of the federal Civil Rights Act of 1964, which prohibit employment discrimination on the basis of race, color, religion, sex or national origin. Although *McDonnell* dealt with racial discrimination, it has been held applicable to cases involving sex discrimination under Title VII. *E. g. Holthaus v. Compton and Sons, Inc.*, 514 F.2d 651, 652–53 (8th Cir. 1975). Moreover, we find the principles enunciated in *McDonnell* to be equally applicable to charges of sex-based wage discrimination brought under AS 23.10.-155.

🀫

■ Appellant does not dispute the trial court's application of AS 09.10.070(3), but argues that the statute should be tolled during the period she was pursuing administrative remedies and during the period in which she was unaware of the discrimination against her (i. e., prior to 1968). We do not agree. Even if we were to find that pursuit of administrative remedies in employment discrimination cases tolled the applicable statute of limitations, we do not find that the sporadic complaints made by Brown to University officials between 1968 and 1972 constitute pursuit of administrative remedies. With regard to appellant's second argument, the statute might possibly be tolled if she had brought suit within two years of discovery of the discrimination, but not, as is the case, where suit was brought some five years after the discovery. Therefore, we hold that the trial court did not err when it limited Brown's recovery of back pay to that earned within two years prior to commencement of her suit.

The case is REVERSED and REMANDED for a determination of damages.

MATTHEWS, J., not participating.