Bilal MUSTAFOSKI, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4419.

Court of Appeals of Alaska.

Jan. 28, 1994.

Rex Lamont Butler, Anchorage, for appellant.

Eric A. Johnson, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Bilal Mustafoski appeals his convictions for third-degree misconduct involving a controlled substance (sale of cocaine), AS 11.71.-030(a)(1), and third-degree misconduct involving weapons (carrying a concealed firearm), AS 11.61.220(a)(1). We uphold the validity of the search warrant issued for Musta-

foski's residence, and we uphold the validity of the indictment against Mustafoski (as it concerns the three counts he was convicted of), but we reverse Mustafoski's convictions because his trial judge, a former state prosecutor, should have recused himself.

### Validity of the Search Warrant for Mustafoski's Residence

Before his trial, Mustafoski sought suppression of all evidence obtained by the police when they entered his house pursuant to a search warrant. Superior Court Judge James A. Hanson denied Mustafoski's motion. On appeal, Mustafoski renews his attack on the search warrant. The State supplied the following information to the superior court when it applied for the search warrant: .

In early 1991, the Bethel Police Department was investigating Mustafoski and other suspected drug dealers. On January 20, 1991, a man who later became known as police agent "Alpha 14" contacted Bethel Police Sergeant John Achee and told him that Mustafoski had agreed to sell him cocaine for $150 per gram. Alpha 14 agreed to work with the police in exchange for the return of his chauffeur's license, which he had lost after being arrested for fourth-degree assault. Alpha 14 had no other criminal record, and he had never acted as an agent before.

On January 21, Sergeant Achee strip-searched Alpha 14, gave him $500 in recorded buy money, and dropped him off near Mustafoski's residence on Akakeek Street in Bethel. When Alpha 14 came out of the residence, he gave Sergeant Achee two 1-gram bags of a white, powdery substance that later field-tested positive for cocaine. Alpha 14 told Achee that he had bought the cocaine from Mustafoski's live-in girlfriend, Lisa Ayers, for $300. Alpha 14 returned the remaining $200 of the buy money, and Sergeant Achee again strip-searched him to make sure he had no other drugs or currency.

A few days later, Achee obtained a *Glass* warrant (*see State v. Glass,* 583 P.2d 872 (Alaska 1978)) to monitor another drug purchase between Alpha 14, Ayers, and Mustafo-ski on Akakeek Street. However, when Alpha 14 came to the residence, Ayers and Mustafoski refused to sell him drugs, apparently because they suspected that Alpha 14 was a police agent. For his services, Alpha 14 received his chauffeur's license but no other compensation. Achee later testified that Alpha 14 had never deviated from his instructions and that Alpha 14 had been, to Achee's knowledge, a reliable informant.

Approximately two months later, on March 24, 1991, Bethel Police Sergeant John Bilyeu pursued the investigation using a Bethel cab driver named Duane Anaruk who was on salary with the department. Bilyeu gave Anaruk recorded buy money and instructed him to try to purchase drugs. In the meantime, during the week of April 1, 1991, Alaska State Trooper Greg Close (who was Mustafoski's next-door neighbor) told Sergeant Achee that he had seen many vehicles coming to Mustafoski's residence on Akakeek Street; people were going in and out of the house during late hours of the night. Based on his training and experience, Achee believed that this pattern of traffic and visitors corroborated police suspicions that Mustafoski was engaged in sales of drugs or liquor.

At about 5:00 p.m. on April 9, 1991, Officer Short again contacted Anaruk about drug purchases. Anaruk reported that Mustafoski had just told him he had received a shipment of cocaine and was ready to sell. Short met with Anaruk on April 10, conducted a pre-buy interview, searched Anaruk and his cab for contraband, and then gave Anaruk $150 in recorded funds. While Short was conducting the pre-buy interview, Anaruk's cab company received a call from Mustafoski, who asked Anaruk to meet him at the Tundra Center. Short instructed Anaruk to tell Mustafoski that he would be right there.

With Short hidden inside the cab's trunk, Anaruk drove to the Tundra Center. At the Tundra Center, Mustafoski got in the cab and had Anaruk drive to Kastriotti's Restaurant. At the restaurant, Mustafoski got out for a few minutes, then got back in and had Anaruk drive to a residence on Akakeek Street. There, Mustafoski got out, knocked on the door, and spoke with a woman who

came to the door. A few minutes later, Anaruk saw Mustafoski come out of the house carrying a small leather overnight bag. When Mustafoski got back in the cab, Anaruk saw that the bag contained a semi-automatic pistol and a revolver. Mustafoski began loading these guns. As he did so, Mustafoski told Anaruk that if he ever "narc'd" on him or turned him in, he would shoot him.

The two men drove to the Assembly of God parking lot on Sixth Avenue. Mustafoski got out of the cab and donned the semi-automatic pistol in a shoulder holster. After Mustafoski got back in the cab, they drove down Sixth Avenue and parked in front of a residence. From his hiding place in the trunk, Short heard Mustafoski get out of the cab and tell Anaruk to wait there five minutes for him. A few minutes later, Mustafoski called Anaruk on the cab's radio and told Anaruk he could leave—that Mustafoski would call for a cab in five or ten minutes. Anaruk then drove away.

When Officer Short climbed out of the trunk, Anaruk gave him a plastic bag containing one gram of a white, powdery substance that field-tested positive for cocaine. Anaruk told Short that Mustafoski had sold him the cocaine while they were inside the cab. Anaruk reported that he had asked Mustafoski for 1.5 grams, but Mustafoski had only one gram. However, Mustafoski said that he could get another gram, which he agreed to sell for $80.

When the radio call from Mustafoski came in, Short got back in the trunk and Anaruk drove to Sixth Avenue. When Anaruk honked the horn, he received no response, so he got out and walked toward the residence. Shortly afterwards, Anaruk returned to the cab with Mustafoski, and they drove to Kastriotti's Restaurant. When they arrived, Mustafoski got out and walked toward the restaurant. Anaruk then left.

Later, Anaruk gave Short another gram of white, powdery substance, which field-tested positive for cocaine. Anaruk told Short that Mustafoski had sold him this cocaine for $100, not the $80 Mustafoski had first promised.

Following his clandestine ride with Anaruk, Short and other Bethel police officers contacted the District Attorney's Office to prepare an application for a search warrant for various residences, among them Mustafoski's. Later, armed with the warrant, the police searched Mustafoski's house and discovered a small electronic scale, a 400-channel radio scanner, a large number of plastic baggies, and 22 grams of lidocaine, a cutting agent for cocaine.

On appeal, Mustafoski contends that the search warrant for his residence must be invalidated for three reasons. First, Mustafoski argues, the State failed to demonstrate the trustworthiness of the information supplied by agent Alpha 14 and by Duane Anaruk.

> When a search warrant is based on the hearsay statement of a confidential informant, the [search warrant application] must establish the informant's basis of knowledge and veracity. To establish the informant's basis of knowledge, the information must be based on the informant's personal observations, not his suspicions or beliefs. . . .
>
> Additionally, the [government] must inform the magistrate ... of some of the underlying circumstances [supporting the conclusion] that the informant was credible or that his information was reliable. An informant's veracity may be established by demonstrating his past reliability, or by independent police corroboration of detailed facts in the informant's story. The personal identity and involvement of the informant may also establish his veracity. When information is provided by a citizen informer rather than an informant from the criminal milieu, there is less need to establish a citizen informer's credibility. It is sufficient that the police verify some of the details of the information provided by a citizen informer.

*State v. Jones,* 706 P.2d 317, 324–25 (Alaska 1985) (citations omitted).

■ Agent Alpha 14 told police that Mustafoski had offered to sell him cocaine. Later, under police supervision, Alpha 14 went to Mustafoski's residence and purchased cocaine from Mustafoski's girlfriend, Lisa Ay-

ers. Mustafoski argues that Alpha 14 was a convicted criminal who was motivated by a promise of official concession (the return of his chauffeur's license), and that therefore all information obtained from him must be ignored when determining whether the search warrant was supported by probable cause.

Mustafoski's conclusion does not follow from his premise. While Mustafoski points out valid reasons to distrust this anonymous informant, the State's search warrant application provided reason for the magistrate to credit his information—in particular, the controlled purchase of cocaine. Mustafoski argues that this purchase was not truly "controlled" because Alpha 14 was out of the supervising police officer's view when the cocaine was sold. However, a drug purchase does not lose its "controlled" character simply because the police agent leaves the supervising officer's sight to enter a house to make the purchase. *See State v. Johnson,* 219 Conn. 557, 594 A.2d 933, 936–37 (Conn. 1991); *State v. Sherlock,* 70 Haw. 271, 768 P.2d 1290, 1293 (1989). Moreover, the testimony of Officer Short and, through him, the information obtained from Duane Anaruk, corroborate Alpha 14's assertions that Mustafoski was a cocaine seller and that cocaine was available for sale at Mustafoski's residence.

Mustafoski also challenges Duane Anaruk's credibility. In the superior court, Mustafoski asserted "upon information and belief" that Anaruk "is known in the community of Bethel to be an abuser and supplier of controlled substances." The superior court was not obliged to invalidate a search warrant based on this sort of unattributed and non-specific allegation. Mustafoski also asserted, again on "information and belief", that, shortly before Anaruk participated in the investigation of Mustafoski, Officer Short had made a traffic stop of Anaruk's taxi "at a time when Mr. Anaruk was in the process of ingesting marijuana." This more specific allegation raised a possible reason to distrust Anaruk's information (that he might wish to incriminate Mustafoski to escape justice himself). However, Mustafoski submitted no affidavit to back up his assertion, and the only sworn testimony on this point was given at Mustafoski's trial: Short testified that he had no knowledge, either personally or through the police department, of any drug use on Anaruk's part, and he specifically denied making a traffic stop of Anaruk's cab when Anaruk was using marijuana. On this record, the superior court could properly find that Mustafoski had failed to substantiate his asserted reason for distrusting Anaruk's account of his dealings with Mustafoski. Moreover, Officer Short was riding in Anaruk's cab during much of the interaction with Mustafoski, and he personally corroborated many facets of Anaruk's account.

■ Mustafoski's next attack on the search warrant is that, even assuming the State established probable cause to believe that Mustafoski was selling cocaine, the State failed to establish sufficient reason to believe that cocaine would be found in Mustafoski's residence. However, agent Alpha 14 purchased cocaine from Mustafoski's girlfriend at that house in January, 1991 (less than three months before the search warrant was issued). Just two weeks before the search warrant was issued, Trooper Greg Close, Mustafoski's next-door neighbor, observed many vehicles coming to Mustafoski's residence and people going in and out of the house during late hours of the night. During this same time period, Mustafoski told Duane Anaruk that he had received a shipment of cocaine and was ready to sell. Anaruk in fact purchased cocaine from Mustafoski the day before the search warrant was issued.

This court has repeatedly stated that a magistrate can reasonably infer that a drug dealer will keep drugs or other evidence of drug sales at his or her residence. *Van Buren v. State,* 823 P.2d 1258, 1263 (Alaska App.1992); *State v. Conway,* 711 P.2d 555, 557 & n. 1 (Alaska App.1985). Even though the State had no direct evidence of a drug sale occurring at Mustafoski's house since January, the State presented evidence that Mustafoski was engaged in on-going sales of cocaine up to the time the search warrant was issued. Given this evidence, the magistrate could reasonably conclude that evidence of drug sales would be found in Mustafoski's home.

Finally, Mustafoski argues that the magistrate should not have authorized the police to conduct a nighttime search of Mustafoski's residence. Alaska Criminal Rule 37(a)(3)(iv) states that a judge issuing a search warrant "shall direct that it be served between 7:00 a.m. and 10:00 p.m., unless ...[,] for reasonable cause shown, [the judge] authorizes its execution at other than this time". The search warrant application was made at 9:20 p.m. The State presented evidence that Mustafoski had sold cocaine twice, just hours before the application. Bethel Police Sergeant Bilyeu testified that he planned to conduct one more controlled cocaine buy and then arrest Mustafoski that night. If news of Mustafoski's arrest spread to his confederates, there was a good chance that evidence would be removed or destroyed before morning. When the magistrate issued the warrant, he specifically agreed with the district attorney's argument that the "expected ... buy and [the] arrest of Mr. Mustafoski tonight would more or less tip the hand of the investigators and [would] require the immediate search of ... his residence." Under these facts, the magistrate did not abuse his discretion when he authorized nighttime service of the warrant.

For these reasons, we uphold the superior court's denial of Mustafoski's suppression motion.

*Validity of the Indictment*

A Bethel grand jury indicted Mustafoski on five criminal charges. Counts 1 and 2 charged Mustafoski with selling a schedule IIA controlled substance in violation of AS 11.71.030(a)(1); Count 3 charged him with third-degree assault in violation of AS 11.41.220(a)(1); Count 4 charged him with coercion in violation of AS 11.41.530(a)(1); and Count 5 charged him with carrying a concealed firearm in violation of AS 11.61.220(a)(1). Before trial, Mustafoski asked the superior court to dismiss the indictment. The superior court denied Mustafoski's motion.[1] Mustafoski renews his arguments on appeal.

First, Mustafoski contends that the indictment should have been thrown out in its entirety because two grand jurors had ties to law enforcement. One of the grand jurors was the mayor of Bethel, an official with supervisory authority over the police department. Another grand juror was a pilot who worked under contract for the Alaska State Troopers. However, these two grand jurors' ties to law enforcement agencies did not disqualify them from serving on the grand jury.

This court has expressly declined to adopt a rule barring police officers from serving on grand juries. *Anderson v. State*, 749 P.2d 369, 372 (Alaska App.1988). If police officers are not automatically disqualified, it necessarily follows that there should be no automatic disqualification for the two grand jurors at issue here—persons with only attenuated ties to law enforcement. We do not believe that the two grand jurors' employment relationship to police agencies automatically proves that their grand jury service was tainted.

In addition, before denying Mustafoski's motion, the superior court examined the

---

1. Superior Court Judge Dale O. Curda decided Mustafoski's pre-trial attack on the indictment. As noted above, and as explained in more detail below, we hold that Judge Curda was disqualified by AS 22.20.020(a)(6) from participating in Mustafoski's case because Judge Curda, in his former role as the Bethel District Attorney, had personally prosecuted Mustafoski within the previous two years. Judge Curda was likewise disqualified from making the pre-trial decision regarding the indictment.

Nevertheless, we will review and decide the validity of the indictment. At the trial court level, Mustafoski's motion was decided purely on the pleadings and the pre-existing grand jury record. When Judge Curda decided the validity of the indictment, he made no determinations of witness credibility or any other decisions to which we must defer. Compare *State v. Conway*, 711 P.2d 555, 557 (Alaska App.1985), in which this court recognized that a trial court judge who decides the sufficiency of a search warrant on a pre-existing record "performs a reviewing function essentially identical to ours", and that we owe no deference to the trial judge's decision. The parties have extensively briefed the indictment issues, and they call on us to decide them. We thus conclude that, under the circumstances of this case, Judge Curda's decision of the grand jury issues at the trial court level was harmless error, and we further conclude that it is appropriate for us to decide these issues despite Judge Curda's disqualification.

grand jury concurrence sheets. The concurrence sheets showed that the grand jurors had voted unanimously to indict Mustafoski on four counts and had voted 17 to 1 to indict Mustafoski on the remaining count. Thus, even if the two grand jurors had been disqualified because of their connection to law enforcement, the grand jury still would have voted in favor of Mustafoski's indictment. *Compare* Alaska Criminal Rule 6(g) (an indictment remains valid, even though unqualified grand jurors sat on the panel, so long as a majority of the qualified grand jurors voted for the indictment).

■ Mustafoski counters that, even though the grand jury's vote heavily favored indictment, the grand jury deliberates as a group, and the grand jury's deliberations may have been tainted by the contributions of the two challenged grand jurors. However, Mustafoski did not show (or offer to prove) that either of the challenged grand jurors was in fact biased (either against Mustafoski or in favor of the government), or that either of the grand jurors exercised undue influence over the rest of the panel. As this court said in *Patterson v. State,* 747 P.2d 535 (Alaska App.1987),

> [The defendant's] argument mistakenly equates the bias of one grand juror [with] bias on the part of the entire grand jury panel. In the absence of particularized circumstances establishing the likelihood of a significant influence on the grand jury as a whole, we see no legitimate basis for imputing the bias of one grand juror to others. Because the grand jury voted unanimously to indict ..., and because [the defendant] has, at most, established bias on the part of only one member of the panel, no deprivation of [the defendant's] right to a fair and unbiased grand jury has been established.

*Patterson,* 747 P.2d at 537. *See also Anderson,* 749 P.2d at 372 (holding that a defendant must show prejudice). We therefore uphold the superior court's refusal to dismiss Mustafoski's indictment on account of the purported bias of the two challenged grand jurors.

■ Mustafoski's second attack on the indictment concerns Counts 1 and 2, which charged Mustafoski with third-degree misconduct involving a controlled substance. Mustafoski asserts that these two counts are facially invalid because they fail to specify either the controlled substance Mustafoski purportedly sold or the person to whom he sold it. Both counts are phrased identically:

> That on or about the 10th day of April, 1991, at or near Bethel, in the Fourth Judicial District, State of Alaska, Bilal Mustafoski did unlawfully and knowingly deliver a Schedule IIA controlled substance.

> All of which is a class B felony offense[,] being contrary to and in violation of AS 11.71.030(a)(1) and against the peace and dignity of the State of Alaska.

We agree with Mustafoski that the wording of these two counts could have been more informative. However, Mustafoski has not shown that he was prejudiced by the lack of detail in these two counts. The grand jury record unambiguously reveals that the two charged sales of controlled substances on April 10, 1991 were the two sales of cocaine to Duane Anaruk. Mustafoski does not claim that he was misled by the wording of the indictment or surprised by the State's case at trial. This being so, the vagueness of the wording of the indictment did not require dismissal of the charges. *See Lupro v. State,* 603 P.2d 468, 472 (Alaska 1979); *Azzarella v. State,* 703 P.2d 1182, 1186 (Alaska App.1985).

■ Third, Mustafoski challenges the sufficiency of the evidence to support Count 5, the allegation that Mustafoski carried a concealed firearm. At grand jury, Anaruk testified that Mustafoski brought an overnight bag containing two handguns into Anaruk's taxi; during the ride, Mustafoski had Anaruk stop in a church parking lot, where Mustafoski got out, put on a shoulder holster, put one of the handguns in the shoulder holster, and then got back in the taxi. Mustafoski points out that Anaruk never explicitly stated that the pistol in the shoulder holster was concealed beneath clothing. However, Anaruk testified that Mustafoski was wearing a coat during the cab ride. It is a fair inference,

from Anaruk's testimony as a whole and from the manner in which shoulder holsters are commonly worn, that Mustafoski wore the shoulder holster underneath his coat, thus concealing the pistol.

■ We additionally note that Count 5 charged a misdemeanor. Even if the grand jury evidence had failed to support this count, the State was authorized to charge Mustafoski by information with carrying a concealed weapon. Thus, Mustafoski would not have been prejudiced even if he had shown that the grand jury evidence was insufficient to support this count. *See S.R.D. v. State*, 820 P.2d 1088, 1097 (Alaska App. 1991).

Finally, Mustafoski challenges the sufficiency of the evidence to support Count 3, the allegation of third-degree assault. This count was based on Duane Anaruk's grand jury testimony that, during their cab ride together, Mustafoski pulled two handguns from an overnight bag and threatened to shoot Anaruk if Anaruk ever "narc'd" on him. We need not decide whether the grand jury evidence supported this charge because the question is moot. The trial judge granted Mustafoski a judgement of acquittal on the third-degree assault charge before the case was submitted to the jury. Despite this acquittal, Mustafoski argues that he was prejudiced by the inclusion of Count 3 among the charges at trial because it allowed the State to introduce evidence of Mustafoski's threatening conduct and his use of handguns. This argument is likewise moot, because (as explained in the next section of this opinion) we are reversing Mustafoski's convictions.

*Mustafoski's Motion to Disqualify Judge Curda*

■ Superior Court Judge Dale O. Curda was assigned to Mustafoski's case. Soon after he was charged, Mustafoski filed a pretrial motion arguing that Judge Curda should be disqualified pursuant to AS 22.20.-020(a)(6):

*Disqualification of judicial officer for cause.* (a) A judicial officer may not act in a matter in which

. . . .

(6) the judicial officer has represented a person as attorney for the person against a party, except the state or a municipality of the state, in a matter within two years preceding the assignment of the judicial officer to the matter[.]

Mustafoski based his motion on the fact that Judge Curda, before becoming a judge, had worked for the Department of Law as the district attorney in Bethel and, in that capacity, had personally prosecuted Mustafoski in connection with other matters within the previous two years. Opposing Mustafoski's motion, the State argued that the statute made an exception for attorneys who had formerly represented the State of Alaska.

Judge Curda denied Mustafoski's motion. Pursuant to AS 22.20.020(c), Judge Curda's decision was reviewed by Superior Court Judge Mary E. Greene. At the hearing in front of Judge Greene, Mustafoski and the State agreed that, within the previous two years, Judge Curda (acting as the State's prosecutor) had presented a case against Mustafoski to the Bethel grand jury.[2] In addition, Mustafoski asserted that it was "conceivable" that Judge Curda had acquired information about Mustafoski through his work as a prosecutor, although Mustafoski's attorney admitted that he did not know whether this was true, or what that information might be.

Judge Greene rejected Mustafoski's interpretation of AS 22.20.020(a)(6); she ruled that this statute did not require Judge Curda's disqualification. And, although Mustafoski had not argued any other theory of disqualification, Judge Greene further ruled that Judge Curda's participation in Mustafoski's present case did not give rise to an inescapable appearance of impropriety; thus, Judge Greene found, Judge Curda's participation did not contravene AS 22.20.020(a)(9) as interpreted by this court in *Perotti v. State*, 806 P.2d 325, 327–28 (Alaska App.

2. Mustafoski has not asserted that there is a

connection between that former case and the

1991).[3]

A judge's refusal to recuse him- or herself is reviewed under the abuse of discretion standard. *Blake v. Gilbert,* 702 P.2d 631, 640 (Alaska 1985); *Perotti,* 806 P.2d at 327. However, to the extent that the decision of Mustafoski's case turns on the proper interpretation of AS 22.20.020(a)(6), this court independently determines the meaning of the statute. *Ford v. Anchorage,* 813 P.2d 654, 655 n. 2 (Alaska 1991).

The general rule at common law was that only a judge's personal interest in the outcome of the lawsuit would require the judge's disqualification; a judge could decide a lawsuit even though the judge had participated as an attorney in an earlier stage of the same lawsuit. *See Hathorne v. State,* 459 S.W.2d 826, 828 (Tex.Crim.App.1970) (on rehrg). Virtually all states and the federal government have changed this common-law rule; these jurisdictions now require a judge's disqualification if he or she has acted as a lawyer in the *same* lawsuit or controversy. *Hathorne,* 459 S.W.2d at 828–29. *See,* for example, 28 U.S.C. § 455 and Michigan Court Rule 2.003(B)(3).

However, the prevalent American rule of disqualification is limited to instances in which the judge participated as a lawyer in an earlier stage of the same case. Under this majority rule, unless there is a specific showing of bias, a judge is not disqualified merely because he or she worked as a lawyer for or against a party in a previous, unrelated matter. *See State v. Neeley,* 748 P.2d 1091, 1094 (Utah 1988); *see also Commonwealth v. Darush,* 279 Pa.Super. 140, 420 A.2d 1071, 1074 (1980) (citing authority for this proposition).

Thus, under the majority rule, a judge who formerly served as a prosecutor is not disqualified from participating in a defendant's case even though he or she personally prosecuted the same defendant in a previous, unrelated case. *People v. Harris,* 117 A.D.2d 881, 498 N.Y.S.2d 893, 894–95 (N.Y.App. 1986); *see also State v. Neeley,* 748 P.2d at 1094; *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727, 730–32 (1983) (holding that the judge's participation does not create a reasonable appearance of partiality); *Hathorne v. State,* 459 S.W.2d at 829. *But see People v. Corelli,* 41 A.D.2d 939, 343 N.Y.S.2d 555 (N.Y.App.1973) (holding that a judge who had formerly secured an indictment against the defendant and who was aware of his "background" should have reassigned the defendant's case to another judge after the defendant chose to waive jury and consent to a bench trial).

In AS 22.20.020(a), the Alaska legislature has enacted a rule of judicial disqualification that is significantly broader than the majority rule. The portion of the statute at issue here, AS 22.20.020(a)(6), declares that a judge is disqualified from a case if, within the previous two years, the judge has acted as the attorney for "[any] person ... against [any] party [to the current lawsuit], except the state or a municipality of the state".

The syntax of subsection (a)(6) clearly suggests that the limiting clause "except the state or a municipality of the state" was intended to modify the word "party", not the word "person". That is, based on its grammatical structure alone, subsection (a)(6) appears to prohibit a judge from participating in any case in which he or she, acting as an attorney for any person, took legal action within the previous two years against any of the parties to the current lawsuit except the

---

present one.

**3.** AS 22.20.090(a)(9) states that a judge should recuse himself or herself whenever "the judicial officer feels that, for any reason, a fair and impartial decision cannot be given." This wording suggests that a judge's decision under AS 22.20.020(a)(9) should turn solely on the judge's subjective perception of his or her personal bias or lack of bias. However, in *Perotti,* this court held that disqualification under subsection (a)(9) is mandated when, under the circumstances of the case, "an unmistakable appearance of bias will arise from a judge's participation in a case". *Perotti,* 806 P.2d at 327. That is, even though a judge's decision to deny a disqualification motion is reviewed under the "abuse of discretion standard", the judge's conclusion that he or she can decide the case fairly will constitute an abuse of discretion whenever "it is plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts." *Perotti,* 806 P.2d at 328, quoting *Amidon v. State,* 604 P.2d 575, 577 (Alaska 1979).

State of Alaska or a municipality of the state. (Moreover, as we will explain, the policy behind subsection (a)(6) unambiguously supports this construction of the statute.)

Thus, if the word "person" in subsection (a)(6) includes political entities such as the State of Alaska, then Judge Curda fits the statutory description: as a prosecutor, he had represented the State of Alaska against Mustafoski within the previous two years. The State argues, however, that the word "person" does not include the State of Alaska.

The State admits that, for purposes of interpreting the criminal code, the term "person" includes a governmental entity such as the State of Alaska. AS 11.81.900(b)(40) provides:

> In this title, unless otherwise specified or unless the context requires otherwise,
>
> . . . .
>
> (40) "person" means a natural person and, when appropriate, an organization, government, or governmental instrumentality[.]

However, the State points out that AS 11.81.-900(b) itself declares that its definitions apply only to Title 11, and the question in this case is the proper construction of the judicial disqualification statute found in Title 22.

The State argues that, because the definitions in Title 11 apply only to that title, and because Title 22 contains no definition of "person" specific to that title, the word "person" AS 22.20.020(a)(6) must be interpreted in accordance with the general definition found in AS 1.10.060:

> In the laws of [this] state, unless the context otherwise requires, ... (8) "person" includes a corporation, company, partnership, firm, association, organization, business trust, or society, as well as a natural person.

As the State notes, the definition of "person" contained in AS 1.10.060 omits any explicit reference to the state government or its political subdivisions. The State contends that the legislature's failure to mention the State of Alaska and its political subdivisions in this definition of "person" evinces an intent to exclude these political entities from coverage.

We disagree with the State's construction of AS 1.10.060. When AS 1.10.060(8) defines "person", it declares that this term "includes" corporations, companies, partnerships, associations, etc., as well as natural persons. The legislature uses the word "includes" in a very specific way. "When the word[ ] 'includes' ... [is] used in a law, [it] shall be construed as though followed by the phrase, 'but not limited to'." AS 1.10.040(b).

We recognize that section (b) of AS 1.10.-040 was enacted in 1991, after the date of Mustafoski's alleged offenses. However, the drafters' commentary to this section states that it was intended to codify pre-existing law:

> Under standard rules of statutory drafting and interpretation, the term "includes" is used preceding a partial listing or illustrative list in a definition, while the term "means" is used to provide a complete meaning for the term defined. The Alaska Supreme Court has adopted this rule [in *Brown v. Wood*, 575 P.2d 760, 767 (Alaska 1978) ]. The proposed provision [i.e., what is now AS 1.10.040(b) ] would enact this standard rule[.]

1991 House Journal, Supp. No. 10 (May 13), p. 2.

This rule of construction explains the different wording of the definitions of "person" found in AS 11.81.900(b)(40) and AS 1.10.-060(8). Assuming that the legislature wanted the definition of "person" to include political entities, it would be necessary for AS 11.81.900(b)(40) to contain an explicit reference to political entities because this statute uses the word "means", which indicates that what follows is "a complete meaning for the term defined". On the other hand, AS 1.10.-060(8) would not require an explicit reference to political entities because this statute employs the word "includes", which indicates that what follows is a partial, illustrative listing.

We therefore reject the State's argument that AS 1.10.060(8) necessarily excludes political entities from the definition of "person". Nevertheless, the State argues that, at least for purposes of AS 22.20.020(a), the word "person" should not include political entities.

The State relies on *Keel v. State,* 552 P.2d 155 (Alaska 1976), for its argument that the State of Alaska should not be considered a "person" for purposes of construing AS 22.20.020(a)(6).

*Keel* dealt with a sibling provision of the same statute, subsection (a)(5), which disqualifies a judge whenever a party to the lawsuit "has retained [the judge] as their attorney or has been professionally counseled by [the judge] in [connection with] any matter within two years preceding the filing of the action". AS 22.20.020(a)(5). The question presented in *Keel* was: if a judge has served as a government attorney within the preceding two years, does subsection (a)(5) disqualify him or her from participating in any lawsuit in which the government is a party? The supreme court held that AS 22.20.020(a)(5) does not require disqualification on this broad a scale. *Keel,* 552 P.2d at 157.

The court noted that the original (pre–1967) version of (a)(5) disqualified a judge from participating in a case if he or she had previously "been attorney in [that] action or proceeding ... for either party". *Keel,* 552 P.2d at 156 n. 2. As the supreme court noted, this older form of the statute concerned itself solely with the problem of a judge who had previously acted as a lawyer in that very case. In such circumstances, the rationale for disqualification is clear:

> However upright the judge, ... however free [he or she might be] from the slightest inclination [to do anything but] justice, there is a peril of ... unconscious bias or prejudice, or that any former opinion formed [during the attorney-client relationship] may still linger to affect unconsciously [the judge's] present judgment, or that [the judge] may be moved or swayed unconsciously by his [or her] knowledge of ... facts which may not be revealed or stated at the trial, or cannot be under the rules of evidence. No effort of the will can shut out memory.

*Keel,* 552 P.2d at 156, quoting *People v. Haas,* 105 A.D. 119, 93 N.Y.S. 790, 792–93 (N.Y.App.1905).

But in 1967, the legislature broadened the scope of (a)(5), redrafting the subsection to disqualify a judge if he or she had acted as attorney for either party in *any* matter within the two years previous to the filing of the current lawsuit. The supreme court explained that the rationale of this amendment was to prohibit judges from participating in cases, not because they might have personal knowledge or opinions about the facts, but because they might have residual loyalty to the party they had represented:

> [B]y expanding [subsection (a)(5)] ...[,] Alaska's legislature evidenced concern about a somewhat distinct problem: namely, that *any* professional relationship between a judge and one of the parties, formed or nurtured in any manner during the months preceding the judge's elevation to the bench, might create a risk of partiality or the appearance of partiality. The [legislature's] concern was that personal loyalties fostered during [the attorney-client relationship] might generate conscious or unconscious partiality, or at least its appearance.

*Keel,* 552 P.2d at 156 (emphasis in the original).

The supreme court nevertheless held that, even though the statute could be read to exclude former government prosecutors from participating as judges in all lawsuits involving the government, the rationale of the statutory prohibition did not extend that far. While the court acknowledged that a former prosecutor would be disqualified from participating "in any case in which he [or she] actually participated ... by counseling or otherwise", *Keel,* 552 P.2d at 157 n. 5, the court pointed out that a judge's former government employment did not, by itself, mean that the judge had pre-existing knowledge of the facts involved in the controversy:

> In the case at bar, the [episode giving rise to the lawsuit did not occur until] several months after Judge Ripley's appointment to the superior court.... Thus, there is no possibility that he might have learned of the facts [of the case] while serving in his prosecutorial role.

*Keel,* 552 P.2d at 157. The court further pointed out that attorneys serving the government do not have the same relationship with their "client" as an attorney would nor-

mally develop with an individual, group, or organization:

> [Moreover,] in the circumstances of a ... judge who had been employed as an Assistant District Attorney, the risk of personal loyalt[y] to [the] former client[ ], engendered by virtue of the special pecuniary nature of the [usual] attorney-client relationship, is greatly diminished. It is unrealistic to assume that representation of such an "artificial and generalized" party as "the State" might foster those kinds of personal bonds that could develop between private counsel and the individuals or groups he [or she] had occasion to serve.

*Keel,* 552 P.2d at 157, quoting *People v. Thomas,* 8 Cal.3d 518, 105 Cal.Rptr. 366, 503 P.2d 1374, 1375 (1972). *Accord People v. Delongchamps,* 103 Mich.App. 151, 302 N.W.2d 626, 628 (1981) (construing Michigan General Court Rule 912.2(4), the predecessor to current Michigan Court Rule 2.003(B)(4)).

The portion of AS 22.20.020 interpreted in *Keel,* subsection (a)(5), addresses the problem of a judge who has previously acted as a lawyer *on behalf of* one of the parties. Mustafoski's case involves subsection (a)(6), which addresses a related but distinct issue: the problem of a judge who has previously acted as a lawyer *against* one of the parties. In such instances, employing the analysis used by the supreme court in *Keel,* there are two kinds of potential difficulties if the judge were to participate in the case: first, the judge might have personal knowledge of the facts, and second, the judge might have lingering animosity toward his or her former adversary.

The State argues that *Keel*'s limiting interpretation of subsection (a)(5) applies equally to subsection (a)(6). The State reasons that, if a judge's former representation of the State does not create the "personal bonds" between lawyer and client that would normally disqualify the judge, it therefore follows that a judge who has previously litigated against a party on behalf of the State will not have formed a disqualifying animosity toward his or her former opponent.

We agree that the supreme court's rationale for limiting the scope of subsection (a)(5)

is relevant when deciding how to construe subsection (a)(6). However, we disagree with the conclusion the State draws from this premise.

*Keel* holds that an attorney does not form a disqualifying loyalty to the State simply by litigating on the State's behalf. This implies that an attorney would not form a disqualifying animosity toward the State simply by litigating against the State. Indeed, subsection (a)(6) codifies this reciprocal rule: the fact that a judge has previously litigated against a party does not disqualify the judge if that party was "the state or a municipality of the state".

But, in the present case, the State reads *Keel* for a quite different proposition: that a government attorney who sues or prosecutes an individual will not form a lawyer's normal level of antipathy toward his or her opponent. This conclusion does not follow from *Keel,* and we do not accept the State's reasoning.

Attorneys, whether in private practice or government service, usually do not form lasting personal animosity toward their legal opponents. However, the reality of law practice is that people on opposite sides of a lawsuit will often do things (perfectly lawful things) that obstruct and anger their opponents. Moreover, even though an attorney may represent the amorphous "government" rather than an individual client, in the arena of legal combat a government attorney is just as likely as a private attorney to conclude that his or her legal opponent is in the wrong and is attempting to use the legal system to gain unjust advantage or to avoid the deserved consequences of prior misconduct. Litigation can easily engender residual ill-feeling which, like residual loyalty, can unconsciously affect a person's judgement and decisions. We believe that this is the reason the legislature enacted a two-year "cooling-off period" in subsection (a)(6).

Accordingly, we construe the word "person" in AS 22.20.020(a)(6) to include the State of Alaska. The statute requires disqualification of a judge who represented the State of Alaska against a party within the previous two years. The State concedes that

Judge Curda, when he was a state prosecutor, personally secured an indictment against Mustafoski less than two years before he acted as a judicial officer in Mustafoski's present case. Even assuming that the prior indictment dealt with an unrelated matter, Judge Curda was disqualified from participating in Mustafoski's present case. For this reason, Judge Curda and Judge Greene should have granted Mustafoski's motion.

We do not imply that Judge Curda harbored or gave any indication of actual bias against Mustafoski. Subsection (a)(6) requires no proof of actual bias, nor does it require proof of a reasonable appearance of bias. Within the two-year period, the statute calls for a judge's disqualification even when the judge is not biased and even when circumstances do not otherwise give rise to an appearance of partiality.[4]

Because Mustafoski's motion to disqualify Judge Curda should have been granted, we reverse Mustafoski's convictions. However, as discussed above, we uphold both the search warrant issued for Mustafoski's residence and the validity of Counts 1, 2, and 5 of the indictment. This case is remanded to the superior court for further proceedings upon that indictment.

The judgement of the superior court is REVERSED.

---

**4.** We note that the legislature allows a party to waive this ground of disqualification. AS 22.20.-020(b).