DECISION.
{¶ 1} Following a jury trial, defendant-appellant Don "Chico" Mitchell was convicted of murder and a gun specification in connection with the shooting death of Darryl James. The conviction triggered a violation of Mitchell's community control, a sanction that had been imposed for an earlier conviction for cocaine possession.
 {¶ 2} On appeal, Mitchell contends that (1) the trial court erred by sentencing him to an eighteen-month prison term for violating his community control; (2) the trial court erred by admitting improper character evidence at his murder trial; (3) he was denied the effective assistance of trial counsel; and (4) his conviction was based upon insufficient evidence and was against the weight of the evidence.
 The Shooting {¶ 3} In the early morning hours of Saturday, February 12, 2005, Darryl James was with his friends Lanay Campbell, Sheena Reid, and Jamel Crossty. The four of them drove to Reflections Jazz Lounge in Northside, a Cincinnati neighborhood.
 {¶ 4} Reflections was located at the corner of Blue Rock and Jo Williams Streets. Directly across Blue Rock from the bar was Lakeman Street.
 {¶ 5} James drove down Lakeman, turned the car around, and parked on the street so that the front of the car faced the bar. When James parked the car, Campbell and Reid noticed that two white cars were parked on the opposite side of Lakeman.
 {¶ 6} James got out of the car and left it running because he intended to be gone only a short time. Campbell, Reid, and Crossty remained in the car. Campbell was sitting in the front passenger seat of James's car. Crossty and Reid were sitting in the back seat.
 {¶ 7} From the car, Campbell was able to see across Blue Rock Street to the front of the bar. She watched as James crossed Blue Rock and went toward the bar. At one point, James walked to the side of the building, along Jo Williams Street, and Campbell lost sight of him.
 {¶ 8} Then a "dark colored" car, which Campbell and Reid described as maroon, drove down Blue Rock and turned onto Lakeman. The car stopped next to James's car on Lakeman, facing the opposite direction. Mitchell got out of the dark car's passenger side and made "like, a skippish run to the bar," according to Campbell.
 {¶ 9} Campbell testified that she did not know Mitchell personally but that she recognized him. When Campbell saw Mitchell, whom she knew as "Chico," she said to Reid and Crossty, "He a grimy a____ n____."
 {¶ 10} Reid did not recognize Mitchell, but she testified that Campbell identified him as "Chico" and said that he was a "grimy a____ n____."
 {¶ 11} Within a few minutes, Mitchell and a one-legged man stood next to each other, outside the bar, at the corner of the building near Jo Williams Street.
 {¶ 12} Campbell testified that she saw Mitchell's arm "out," "going like this (indicating)," and that she heard "like, eight pops, * * *, and I seen mass lightening [sic], and the one[-]legged man skipped back. Skipped, trying to hop away, like he was trying to run." According to Campbell, the popping sounds and flashes were coming from Mitchell: "[H]e had something in his hand. Had to be, it was a gun."
 {¶ 13} Reid, too, had seen Mitchell standing at the side of the door to the bar, before she heard five or six gunshots. She testified that she saw "sparks flying, * * * [s]aw the flames coming out of the gun the same time I heard the gunshots." But she could not see Mitchell or James at the time the shots were fired.
 {¶ 14} Then Mitchell ran across Blue Rock to one of the white cars parked on Lakeman. Reid noticed that Mitchell had a gun in his hand, but Campbell did not see anything in his hands.
 {¶ 15} Campbell panicked and began screaming. She said to her friends, "[Y]ou all, that got to be Darryl. He dead. He is dead." Reid pleaded with Campbell to be quiet so that Mitchell would not come over to their car to kill them.
 {¶ 16} Mitchell got into the white car and drove away. Neither Campbell nor Reid had noticed anyone else in the car.
 A Passenger in the White Car {¶ 17} Glenda Bullock, a fifteen-year-old girl, testified that, on the night of the shooting, she and Mitchell had been driving around in a white Neon automobile.
 {¶ 18} According to Bullock, Mitchell drove to a bar on Blue Rock. She did not know the name of the bar. She said that Mitchell parked on a side street, facing away from the bar. When Mitchell got out of the car, Bullock stayed in the car.
 {¶ 19} Another car, which Bullock described as "like, a dark green," pulled onto the side street and stopped. Mitchell got into the dark car, which then drove off.
 {¶ 20} As Bullock was waiting, she heard six gunshots and then saw Mitchell jogging towards her. She did not notice anything in Mitchell's hands.
 {¶ 21} When Mitchell got to the car, he told Bullock that somebody had been shot. Mitchell said that "he seen somebody get shot in the head, and they fell, and then they kept on shooting him."
 {¶ 22} Mitchell and Bullock drove away.
 The Investigation {¶ 23} At the crime scene, Cincinnati police officers recovered seven spent.40-caliber Federal brand cartridge casings that were lying on the ground near James's body. Farther away from the body, police found two discharged copper jackets, one of which still contained its lead bullet. Police also conducted interviews of witnesses.
 {¶ 24} Later that same day, police charged Mitchell with James's murder, and a warrant was issued for his arrest.
 Mitchell's Statement to Police {¶ 25} On February 13, 2005, the day after the shooting, Mitchell surrendered to police and submitted to an interview.
 {¶ 26} According to Mitchell, he had been with his girlfriend, Ameenah Muhammad, when he received a phone call from a "crackhead" named Kay or Kate, who wanted to buy drugs from him. So Mitchell arranged to meet her in Northside at a gas station.
 {¶ 27} Then Mitchell drove Muhammad's rented white Neon automobile to pick up Bullock on his way to Northside. While he was driving, Mitchell got a call from his cousin Andre "One Leg" Mitchell. Andre told him to come to Reflections.
 {¶ 28} Mitchell said that he parked the Neon on Lakeman and left Bullock in the car. Mitchell went into the bar and had a beer with Andre. After two or three minutes, Mitchell and Andre walked out of the bar. Just then, they heard a gunshot. They turned their heads and saw a man lying on the ground and another man standing over him with a gun in his hand.
 {¶ 29} Mitchell said that he and Andre saw the shooter squeeze the trigger and fire two more times at the victim before he and Andre ran away. Mitchell said that he heard more gunshots as he ran.
 {¶ 30} Mitchell said that he ran to the Neon, told Bullock what had happened, and drove away. He said that he had forgotten about the drug sale at the gas station.
 {¶ 31} Mitchell's only description of the shooter was that he was a male and that he and the victim had both been wearing white shirts. Mitchell said that he had not seen the shooter's face.
 {¶ 32} Mitchell said that he did not report the shooting to the police because he had an outstanding warrant, and because he assumed that other people at the scene would alert the authorities.
 {¶ 33} Mitchell said that he did not know James and had "never had dealings with him." He and Mitchell had once served time on the same floor of a local jail facility, but they had never spoken to each other.
 {¶ 34} Mitchell gave to police the clothing that he had worn at the time of the shooting, so that the police could conduct tests on it. Testing on Mitchell's clothing revealed a single particle of gunshot residue.
 Further Investigation {¶ 35} An autopsy revealed that James had sustained multiple gunshot wounds to his head and body, and that the cause of his death was a gunshot wound to the head. Stippling on the surface of two of James's head wounds and soot around bullet holes in his clothing indicated that a weapon had been fired at close range, within several feet. The coroner's autopsy recovered five .40-caliber bullets from James's body.
 {¶ 36} Testing of the discharged cartridge casings recovered from the scene of the shooting revealed that they had all been fired from the same weapon.
 {¶ 37} Muhammad brought the white Neon automobile to police and consented to its being searched. The police found no evidence in the Neon, and they did not submit it to the coroner's laboratory to test for trace evidence because "[i]t was evident that the car had been recently cleaned and, also, usually gunshot residue, from what we're told, is four to six hours in a confined area, chances are less of getting anything."
 {¶ 38} Police searched Mitchell's telephone records from the evening of Friday, February 11, 2005, through the time of the shooting, and they learned that "every phone call that we went through we could not find anybody named Kay. We had accounted for every person that we talked to and their relationship with Mr. Mitchell, and we did not identify anybody named Kay or Kate."
 The Mother of the Victim's Child {¶ 39} Jetaura McKinney testified that, a few months before the shooting, James was in jail. McKinney was visiting a friend, when Mitchell came to the friend's house. McKinney had not met Mitchell before.
 {¶ 40} When Mitchell learned that McKinney was the mother of James's child, Mitchell said that he knew James from the jail. McKinney described Mitchell's reaction: "And [Mitchell] just said, like, oh, on Northside. That n____ has a price on his head. * * * [F]or snitching and telling on people for robbing people."
 {¶ 41} According to McKinney, James had gotten out of jail just a week before the shooting occurred.
 Sentencing for the Community-Control Violation {¶ 42} In September 2003, Mitchell pled guilty in drug court to possession of crack cocaine, under R.C. 2925.11(A), a felony of the fourth degree. The drug-court judge sentenced Mitchell to three years' community control and advised him that, upon a violation, the court would impose a seventeen-month prison term. In May 2004, after finding Mitchell guilty of violating his community control, the drug-court judge sentenced him to three years and three months' community control. At that time, the judge advised Mitchell that a violation would result in a sentence of eleven months in prison.
 {¶ 43} After Mitchell was indicted for murder, supervision of his community-control sanction for the earlier drug conviction was reassigned from the drug court to the judge of the general division of the common pleas court who had been assigned to the murder case. Following Mitchell's murder conviction, the trial court found him guilty of violating his community control and sentenced him to eighteen months in prison.
 {¶ 44} On appeal, Mitchell now argues that the trial court was precluded from imposing a sentence greater than the eleven-month prison term specified by the drug-court judge at the earlier sentencing.
 {¶ 45} When a trial court sentences an offender to community control, it must notify the offender, at the time of sentencing, of the specific prison term that may be imposed for a community-control violation, as a prerequisite to imposing a prison term on the offender for a subsequent violation.[1]
 {¶ 46} If an offender violates community control, the trial court has several sentencing options. The court may impose a longer time under the same sanction (not to exceed a total of five years), a more restrictive sanction,[2] or a prison term.[3] If the court imposes a prison term for the violation, the term must not exceed the prison term specified in the notice provided to the offender at the original sentencing hearing.[4]
 {¶ 47} When sentencing an offender for a community-control violation, if a court opts to continue the offender on community control, the court must, at that sentencing hearing, notify the offender of the specific prison term that may be imposed for an additional community-control violation, as a prerequisite to imposing a prison term on the offender for a later violation.[5]
 {¶ 48} So in this case, the imposition of a prison term for Mitchell's latest community-control violation was governed by the drug-court judge's notification given at the sentencing hearing on Mitchell's earlier violation. At that earlier sentencing, the drug-court judge notified Mitchell that the specific prison term that would be imposed for a violation of community control was a term of eleven months. Thus, upon Mitchell's murder conviction, the prison term imposed for the community-control violation could not exceed the prior term specified in the notice provided to Mitchell at the earlier sentencing hearing in drug court.
 {¶ 49} This result seems absurd. Mitchell's violation was not a simple failure to report to his probation officer or a positive drug test. He committed murder and was imprisoned for a term of eighteen years to life. Yet we are compelled to shave seven months from Mitchell's eighteen-month sentence on the community-control violation, because the drug-court judge specified that an eleven-month term would be imposed for such a violation.
 {¶ 50} Certainly, the drug-court judge could not have predicted the severity of a future violation of community control. Nonetheless, in continuing Mitchell on community control, the judge was required, at that time, to determine an appropriate and specific prison term in case Mitchell committed yet another violation.
 {¶ 51} The Ohio Supreme Court acknowledged in State v.Brooks[6] that the prediction required of the sentencing court is speculative, but necessary: "[T]he intent underlying R.C. 2929.19(B)(5) is obviously for the trial court to predict what the consequences should be for a possible future violation of the conditions and to assign a numbered specific term consonant with its prediction."[7]
 {¶ 52} Accordingly, we sustain the first assignment of error. But we reject Mitchell's additional contention that, having not previously served a prison term, he should have been sentenced to the minimum prison term (six months for a felony of the fourth degree) as required by R.C. 2929.14(B). In State v.Foster,[8] the Ohio Supreme Court declared R.C. 2929.14(B) to be unconstitutional. As a result, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing * * * more than the minimum sentences."[9]
 Admission of Evidence {¶ 53} In his second assignment of error, Mitchell argues that the trial court erred by admitting improper character evidence.
 {¶ 54} Mitchell points to the following exchange during the direct examination of state's witness Lanay Campbell:
 {¶ 55} "Q. Now, you said you saw Chico. Did you know him before this date?
 {¶ 56} "A. I seen him, yes, I didn't know him personally, but I knew who he was, and I seen him.
 {¶ 57} "Q. Okay. So you saw a person get out of this dark car, and you identified that person as Chico, correct?
 {¶ 58} "A. Yes, sir.
 {¶ 59} "Q. Okay. Did you say anything about him?
 {¶ 60} "A. Yes, I did.
 {¶ 61} "Q. What did you say?
 {¶ 62} "A. I said, my exact words were, he a grimy a____ n____.
 {¶ 63} "Q. Okay. What did you mean by that?
 {¶ 64} "A. I just mean that he was scummy, was dirty. They know him for doing dirty things. Doing dirty things to people."
 {¶ 65} Mitchell also directs us to the direct examination of Sheena Reid:
 {¶ 66} "Q. Okay. What about Lanay or [Crossty], did they know that person?"
 {¶ 67} "A. Lanay did.
 {¶ 68} "Q. How do you know that?
 {¶ 69} "A. Because she said — she said that his name was Chico, and he was grimy, and that was it.
 {¶ 70} "Q. Okay. Did she call him a grimy a____ n____?
 {¶ 71} "A. Yes, that's what she called him."
 {¶ 72} Mitchell failed to object to the trial court's admission of the testimony, so he has waived all but plain error.[10] Plain error does not exist unless, but for the error, the outcome of the trial clearly would have been different.[11]
 {¶ 73} Generally, the state may not offer evidence of an accused's bad character until the accused offers evidence of his good character or reputation.[12] But in this case, the challenged statements were relevant to establish that both witnesses had seen Mitchell, and that Campbell had immediately recognized him and identified him to her companions. While Campbell's stated reason for her use of a derogatory term was irrelevant and in a general way portrayed Mitchell as a bad person, we find no plain error. We cannot say that the admission of Campbell's vague reasoning for her use of a pejorative term was outcome-determinative in light of the evidence adduced at trial.[13] We overrule the second assignment of error.
 Ineffective Assistance of Defense Counsel {¶ 74} In his third assignment of error, Mitchell argues that he was denied the effective assistance of defense counsel because counsel failed to object to the improper character evidence. But the failure to make objections, by itself, is not enough to sustain a claim of ineffective assistance of counsel.[14]
To prevail on such a claim, Mitchell must demonstrate that there was a substantial violation of counsel's duties and that he was materially prejudiced by counsel's ineffectiveness.[15]
 {¶ 75} We find no substantial violation of counsel's duties. Given that Campbell did not relate any specific instances of Mitchell's bad conduct in her explanation of the derogatory term, counsel could have concluded that her use of the term indicated personal bias and would have reflected poorly on her character, as well as on her veracity.
 {¶ 76} Moreover, as we stated in our discussion of the second assignment of error, Mitchell has failed to show that there was a reasonable probability that the outcome of his trial would have been different had counsel objected.[16] We overrule the third assignment of error.
 Weight and Sufficiency of the Evidence {¶ 77} To determine whether a conviction is based upon sufficient evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[17] In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[18] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[19]
 {¶ 78} Mitchell was indicted for murder under R.C.2903.02(A). To find Mitchell guilty of murder, the jury had to find that Mitchell had purposely caused the death of James.
 {¶ 79} Following our review of the record, we hold that the state presented sufficient evidence of murder. The jury could have reasonably found that Mitchell's repeated firing of a powerful firearm at close range into James's body evinced a purpose to kill.[20]
 {¶ 80} Given the state's evidence that Mitchell had used an automatic firearm to kill James, his conviction for the firearm specification was also supported by sufficient evidence.
 {¶ 81} Mitchell argues that the testimony of state's witnesses Campbell, Reid, and Bullock contained significant inconsistencies, and that the state's physical evidence was lacking.
 {¶ 82} The evaluation of the credibility of the witnesses was for the jury. This is not the "exceptional case in which the evidence weighs heavily against the conviction."[21]
 {¶ 83} Accordingly, we hold that Mitchell's convictions were based upon sufficient evidence and were not against the manifest weight of the evidence. We overrule the fourth assignment of error.
 Conclusion {¶ 84} We vacate the sentence imposed for the community-control violation in the case numbered B-0305130 and remand this cause to the trial court to correct its entry to reflect the imposition of an eleven-month prison term for that violation. In all other respects, the trial court's judgment is affirmed.
Sentence vacated in part and cause remanded.
Hildebrandt, P.J., and Painter, J., concur.
[1] R.C. 2929.19(B)(5) and 2929.15(B); State v. Brooks,103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837, paragraph two of the syllabus.
[2] See R.C. 2929.16, 2929.17, and 2929.18.
[3] R.C. 2929.15(B).
[4] Id.; Brooks, supra, 2004-Ohio-4746, 814 N.E.2d 837, at ¶ 22.
[5] State v. Fraley, 105 Ohio St.3d 13, 2004-Ohio-7110,821 N.E.2d 995.
[6] Brooks, supra.
[7] Id. at ¶ 31.
[8] 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
[9] Id. at paragraph seven of the syllabus.
[10] Evid.R. 103(A)(1); Crim.R. 52(B).
[11] See State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph two of the syllabus.
[12] Evid.R. 404(A)(1); State v. Williams (1988),38 Ohio St.3d 346, 350, 528 N.E.2d 910.
[13] See State v. Tibbetts, 92 Ohio St.3d 146, 161, 2001-Ohio-132, 749 N.E.2d 226; State v. Hirsch (1998),129 Ohio App.3d 294, 308-309, 717 N.E.2d 789.
[14] State v. Conway, 108 Ohio St.3d 214, 246, 2006-Ohio-791,842 N.E.2d 996, at ¶ 168, citing State v. Holloway (1988),38 Ohio St.3d 239, 244, 527 N.E.2d 831.
[15] Conway, supra, at 246, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 168.
[16] Id.
[17] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[18] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
[19] Id.
[20] See Conway, supra, 108 Ohio St.3d 214, 2006-Ohio-791,842 N.E.2d 996, at ¶ 136.
[21] See Thompkins, supra, at 387, citing State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.