[Cite as *State v. Sims*, 2021-Ohio-1296.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,            :

                    v.                   :

JERRY SIMS, JR.,                             :

    Defendant-Appellant.           :

No. 109335

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 15, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-623047-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Maxwell Martin and Brian Kraft, Assistant Prosecuting Attorneys, *for appellee.*

Patituce & Associates, L.L.C., Kimberly Kendall Corral, and Megan M. Patituce, *for appellant.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Around midnight on October 21, 2017, East Cleveland police and firefighters responded to a call for a van engulfed in flames. They arrived at the scene to find the remains of a burned body inside the vehicle. Through its

investigation, the police identified defendant-appellant Jerry Sims, Jr. ("appellant") as the suspect in the killing of Jamarr Forkland ("victim"). At the jury trial, appellant's girlfriend, Erica Campbell, testified that appellant shot the victim and later, with a friend's help, set the victim's vehicle on fire. Her testimony was corroborated by the cellphone data and a surveillance video. Appellant maintained his innocence; an inmate from the prison testified for the defense, taking responsibility for the murder.

{¶ 2} The jury found appellant guilty of aggravated murder and several related offenses, and the trial court sentenced him to life in prison with parole eligibility after 40 years. On appeal, appellant claims the guilty verdict should be reversed because of prosecutorial misconduct, ineffective assistance of trial counsel, improper admission of character evidence, the trial judge's failure to recuse himself, insufficient evidence, his conviction being against the manifest weight of the evidence, and the cumulative effect of trial errors. After a careful review of the record and applicable law, we affirm the trial court's judgment.

**Testimony by the State's Witnesses**

{¶ 3} At trial, the state presented the testimony of 16 witnesses, including appellant's girlfriend, who was with appellant in the evening of the murder, several individuals present at the used car lot prior to the murder incident, the police officers investigating the case, a forensic scientist, the deputy medical examiner, a firearms examiner, and a cell phone tower data analyst. They testified to the events

in the evening of the murder and the police investigation leading to appellant's arrest for the murder.

### a. Michael Smith, Booker Edwards, and Shawndell Lilly

{¶ 4} Michael Smith, Booker Edwards, and Shawndell Lilly, who were acquaintances of the victim, testified to the events the evening of October 21, 2017, preceding the murder of the victim. They were among a group of men congregating and drinking at the used car lot before appellant showed up at the car lot and started a fight with the victim.

{¶ 5} Michael Smith, a close friend of the victim, testified that the victim operated the used car lot. A group of friends gathered there that evening to celebrate Shawndell Lilly's birthday. Later in the evening, appellant pulled into the car lot in a car driven by a woman. After getting out of the vehicle, appellant walked toward where Smith and the victim were standing. Without any greeting words, he said to the victim in an aggressive tone, "you know I owe you, right?" The victim did not respond. Appellant repeated it a second time, then grabbed a bottle of wine and broke the bottle over the victim's head. Smith caught a glimpse of a black gun on appellant's hip. Appellant and the victim began to wrestle with each other. Smith quickly left. The next day, he found out the victim had been killed. He went to the police and provided them with information about what he saw at the car lot.

{¶ 6} Booker Edwards, who was the victim's partner in operating the used car lot, was at the car lot for a while but left early in the evening before appellant

arrived. When he returned to the car lot the next morning, unaware of the victim's death, he saw glass on the ground.

{¶ 7} It was Shawndell Lilly's birthday the group of men gathered to celebrate. Lilly testified appellant and his girlfriend Erica Campbell came to the gathering in a vehicle. Soon after, he heard a bottle break and appellant and the victim were fighting. Lilly and others tried to break up the fight, asking appellant why he was angry at the victim. Appellant said that he would tell them later.

{¶ 8} Lilly's testimony alluded to a possible motivation for the murder. He testified that he knew appellant as a family friend because Lilly's cousin Jwan Boyd — whom appellant treated as an uncle, as others testified — has children with appellant's aunt; Boyd was present at the lot that night but did not testify. When asked about the relationship between appellant and Boyd, Lilly testified that the two were falling out "because Jamarr [the victim] didn't want him [referring to Sims] at the shop no more." Lilly thought that was why appellant "got so mad" because the victim "didn't want him up there no more." Regarding appellant and the victim's relationship, he stated that "[t]hey [were] cool some days, but, like I said, towards the last week or two, they had been getting into it."

{¶ 9} During the scuffle, Lilly saw appellant pull his gun out, but Boyd told him to put down the gun. Lilly left when appellant and the victim were still fighting. When Lilly left, the only people remaining at the car lot were Boyd, the victim, appellant, and appellant's girlfriend Erica Campbell.

{¶ 10} Under cross-examination, Lilly stated that appellant was not acting "fishy" when he saw him the next day. Lilly also acknowledged that he had told the detectives that many of the victim's customers were upset with the victim because he sold them cars that were "lemons."

### b. Erica Campbell

{¶ 11} Erica Campbell, a social worker, started dating appellant in May 2017. At the time both were involved in another relationship, so they would spend time at the car lot to avoid being seen together by others. They were at the lot almost daily. On the day of the incident, she met appellant after work at the house of Brandon Montgomery, a friend of appellant. After several hours at the house drinking and socializing, she and appellant got into an argument and they left. She was taking appellant home in her vehicle when appellant received a phone call from "Unc" — referring to Boyd — and "Unc" told appellant he needed him to come to the lot. Appellant asked her to drive him there.

{¶ 12} After they arrived, appellant exited the vehicle. He first urinated on the building on the lot and then walked over to the crowd of people congregating at the lot. She was about to leave when she heard some commotion and saw in her rearview mirror appellant and the victim fighting. Appellant placed the victim in a headlock and was punching him. Boyd tried to break up the fight. She exited her vehicle and yelled at appellant to stop. She then drove her vehicle toward where the fighting was taking place. The fight was eventually broken up, and others started to leave the car lot.

{¶ 13} Eventually, the only people remaining were appellant, Campbell, the victim, and Boyd. Boyd came to Campbell's car and asked if she and appellant had been drinking. Appellant saw the two talking and yelled at Boyd "don't talk to that bitch." Campbell wanted to leave, but Boyd asked her not to leave without appellant. Campbell drove her vehicle off the car lot and waited in a street in front of the lot. After she left the lot, Boyd left too. The victim was also leaving in his vehicle, a blue van. However, appellant, still inside the lot, closed the gate. Campbell thought they were going to start fighting again. She saw appellant walking toward the van and soon heard gunshots. Based on what she saw, she concluded "Jerry shot Jamarr." Appellant then ran toward her vehicle and got in. He was holding a gun in his hand, which she had seen him carrying in the past.

{¶ 14} Appellant appeared shocked, saying "me and Unc [are] going to fall out about this." He was shaking his head and screaming "f***, f***, f***," as if he could not believe what he had done. She started to drive away from the car lot, but appellant had her return to it. Appellant got out of her vehicle to switch off the lights of the victim's van and closed the gate of the lot. Once he returned to her vehicle, he called Brandon Montgomery, saying to him repeatedly "I need you." Appellant then directed Campbell to drive to Montgomery's residence, located in the west side of Cleveland. When they arrived, Montgomery was standing in his driveway waiting for them. Appellant exited Campbell's vehicle to talk to him, and then both of them entered her vehicle. They told her to pull into a gas station nearby. Once there,

appellant told her to go inside the store to purchase a gas can and two pairs of gloves, and to fill the gas can with gasoline.

{¶ 15} Campbell then drove them back to the car lot. She was told to park her vehicle next to "Rally's" across from the car lot. Appellant exited the vehicle and told Montgomery to stay with her. Appellant went inside the lot while Montgomery switched to the driver's seat in Campbell's vehicle. Montgomery then received a phone call from appellant. After the call, Montgomery drove the vehicle inside the lot and then handed the gas can to appellant. They both walked toward the victim's van. Minutes later, Montgomery returned to Campbell's vehicle and appellant was driving the victim's van. Montgomery directed Campbell to follow the van.

{¶ 16} They drove through some side streets before arriving at Wadena Street. Both appellant and Montgomery exited their vehicles. While she sat at her vehicle, she saw appellant pouring gas on the van. She then heard a loud boom and saw the van on fire. Both appellant and Montgomery ran toward her vehicle and got inside. They instructed her to return to the car lot. Appellant and Montgomery entered the car lot and later emerged carrying some plastic bags. Campbell testified that she did not attempt to contact anyone for help during the entire evening because she did not want to do anything to cause appellant to harm her.

{¶ 17} Campbell then drove her vehicle to Montgomery's residence to drop him off. Appellant insisted that she stay with him that night, so Campbell stopped at her own house to pick up some items she needed. They then drove to appellant's mother's house and stayed there for the night. She said to him, "I never thought

you'd put me in a situation like this," to which appellant responded "if I go down, we all going down."

{¶ 18} The next morning, Campbell left appellant when she woke up. Later in the day, she checked Instagram and saw people posting about the victim's death. Initially, she did not want to go to the police because she was afraid to put her family in danger.

{¶ 19} When she learned the police were looking for her for information relating to the incident, appellant, his sister, and Montgomery tried to coach her on what to tell the police. They told her to tell the police that appellant and the victim got into a fight, but she and appellant left and stayed at appellant's mother's house for the night. In the presence of these individuals, Campbell called the police department to arrange for an interview. In that interview, she told the police that appellant and the victim got into a fight, but she and appellant left to go to a liquor store, and then went to appellant's mother's house and stayed there for the night. During the interview, however, she had an inkling that the police knew more about the murder than she had expected. After the interview, she was arrested and put in jail.

{¶ 20} While in jail, Campbell met with an attorney provided by her parents, as well as her parents. The attorney told her she was being charged with obstruction of justice. She then did a second interview with the police and provided a statement implicating appellant in the victim's death. Subsequently, after learning appellant was incarcerated, she did a third, final interview with the police, where she told the

detectives about Montgomery's involvement. The prosecutor's office later helped her move her family to a different location.

### c. The Investigating Officers

**{¶ 21}** Officer Travis Kesecker of East Cleveland police department was one of the officers responding to the call of a car engulfed in flames on Wadena Street. After the fire was extinguished, he inspected the area around the burnt vehicle. He noticed the vehicle to be missing the gas cap and found the gas cap on the ground on the vehicle's rear passenger side.

**{¶ 22}** Daniel Mabel, a forensic scientist at the Cuyahoga County Medical Examiner's Office, was unable to perform firearm or gunshot analysis on the body due to the body's condition. He did discover a charred 9 mm Luger cartridge casing in the engine compartment of the vehicle.

**{¶ 23}** Dr. Erica Armstrong, a deputy medical examiner of the Cuyahoga County Medical Examiner's Office, performed the autopsy. The autopsy showed ten gunshots wounds throughout the body and eight bullets were collected. There was alcohol, PCP, and marijuana in the victim's system. A surgical plate with identification numbers in the body enabled her to discover the identity of the charred body.

**{¶ 24}** James Kooser, a firearms and tool marks examiner from the Cuyahoga County Regional Forensic Science Laboratory, was able to identify six of the eight autopsy bullets as having been fired from the same 9 mm caliber pistol.

The other two bullets were too damaged to be analyzed. The weapon that had fired the bullets was never found.

{¶ 25} Kooser compared the spent cartridge casing found in the engine compartment of the burnt vehicle to nine spent cartridge casings the police had recovered from a different crime scene in Cleveland, and he was able to determine that they were all fired from the same 9 mm caliber pistol.

{¶ 26} Sergeant Reginald Holcomb of East Cleveland police department was one of the police officers who apprehended appellant and Montgomery at appellant's sister's apartment. During the patdown of appellant, some gun magazines were found in his pockets.

{¶ 27} Detective Kenneth Lundy was also involved in the investigation of the homicide. He interviewed Jwan Boyd, Shawndell Lilly, Michael Smith, and Campbell. He also interviewed appellant, together with Sergeant Holcomb and Detective Harvey. Appellant stated a fight broke out between him and the victim at the car lot, and he struck the victim with a wine bottle. He left in Campbell's vehicle, however, and they went to a liquor store before going to his mother's house to stay the night there. Later in the interview, appellant admitted he returned to the car lot because he lost his keys. He denied being involved in the victim's death.

{¶ 28} Jacob Kunkle, a special agent with the Federal Bureau of Investigation and a cell phone records analyst, mapped three cell phone numbers involved in this case — two phone numbers associated with appellant and one with Montgomery. Based on his analysis of the cell phone records, he testified regarding

the location data of these phones. The data showing the phones' locations and movements were consistent with Campbell's account of how the events unfolded on the night of the murder.

{¶ 29} The police were able to obtain a surveillance video on Wadena Street near where the victim's burned van was discovered. When Special Agent Robert Surgenor of the Ohio Bureau of Criminal Investigation examined the footage, he found the time displayed in the video was off — it was 10 hours and 40 minutes ahead of the actual time. When the time was properly adjusted, the video showed certain events beginning at 11:41 p.m. culminating in an explosion of a vehicle. The video footage showed a vehicle, which had its headlights off, pull up, followed by another vehicle, which had the headlights on. There was then a movement of what appears to be a person towards the front vehicle — the vehicle without the headlights. Soon thereafter, that vehicle exploded, and 43 seconds after the explosion, the other vehicle left the scene. The video was played for the jury.

{¶ 30} Several months before the trial in this case, Detective Lundy heard an individual by the name of Antonio Roberson, an inmate in the county jail, allegedly confessed to the victim's murder. Detective Lundy went to interview Roberson, but he refused to talk. Detective Lundy later learned that Roberson and appellant had been housed on the same pod in the county jail.

{¶ 31} Detective Joseph Marche testified that Roberson had made a similar claim about another murder involving a suspect by the name of Brico Allen. However, Marche's investigation showed that Roberson was in the county jail at the

time of that homicide. Furthermore, Roberson shared a pod with Allen at the time he confessed to the murder involving Allen. During the cross-examination of Detective Marche, the defense counsel alluded to Campbell's testimony that showed that she told the truth after being placed in the jail overnight, and asked Detective Marche if the jail was a "truth-telling jail." Marche agreed.

**Witness for the Defense**

{¶ 32} Roberson testified for the defense. He was serving a four-year prison term for aggravated robbery at the time of the trial. He testified that he did not know appellant before they were inmates on the same pod in the county jail. Before he met appellant on the pod, he heard of other inmates talking about the murder case. He first confessed to the murder to one of the inmates before he told appellant about his involvement in it. Appellant suggested that he contact appellant's attorney. On May 23, 2019, Roberson wrote to appellant's counsel and confessed to the murder in a letter.

{¶ 33} Roberson testified that he met the victim once or twice before the day of the murder. He did not remember the date of the murder, except that it was sometime in November 2017. On that day he ran into the victim at the Rally's near the Windermere Rapid Station in East Cleveland around 11 p.m. The victim asked him about getting PCP and marijuana. They drove in the victim's vehicle to a building known as the Butternut. After Roberson got the drugs, they drove around while using drugs. They ended up on a side street, the name of which he could not recall. While high and delusional from the drugs, he got out of the vehicle and shot

the victim, who was still in the driver's seat, multiple times with a 9 mm gun he had with him. He did not remember how many times he shot him, or other details about the shooting, because he was high from the drugs.

{¶ 34} Roberson then poured gasoline over the victim's body, using the gas from a gas can in the victim's van. After setting the vehicle on fire, he ran from the scene, carrying the gas can with him, for fear that his fingerprints would be detected. He refused to disclose where he disposed of the gas can or the gun used to kill the victim.

{¶ 35} When asked about his confession to the murder involving Brico Allen, he denied killing the victim in that case and only admitted selling the murder weapon to Allen. When asked about his incarceration at the time of that murder, Roberson testified that he was at a CBCF facility and he escaped the facility.

**Conviction and Appeal**

{¶ 36} Appellant was indicted for 11 counts, including aggravated murder, aggravated arson, felonious assault, and several weapons offenses. After the trial, the jury found him guilty of all counts except for one of the two felonious assault counts. On appeal, appellant assigns the following eight errors for our review:

> I. The state engaged in prosecutorial misconduct throughout the course of the trial that deprived defendant of his right to a fair trial.

> II. The individual and cumulative effect of defense counsel's errors rendered counsel's performance deficient to the point of being ineffective, denying appellant his constitutional right to effective assistance of counsel.

III.  The trial court erred in permitting the introduction of improper character evidence in violation of Evidence Rule 404(A)(1), denying appellant his constitutional right to a fair trial.

IV.  The trial court erred in admitting surveillance video, withheld from defense until the start of trial in violation of Criminal Rule 16.

V.  The trial court erred [in] failing to recuse himself or in the alternative secure a valid and knowing agreement[,] violating appellant's right to a fair trial.

VI.  Appellant's conviction was against the manifest weight of the evidence.

VII.  The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.

VIII.  The cumulative effect of the multitude of errors in this case deprived defendant of his constitutionally guaranteed right to a fair trial.

{¶ 37} We address these assigned errors out of order and review first the sufficiency-of-evidence and manifest-weight claims first.

**Sufficiency and Manifest Weight of the Evidence**

{¶ 38} Under the seventh and sixth assignment assignments of error, appellant claims the state fails to present sufficient evidence for his guilt, and his conviction is against the manifest weight of the evidence.  We address these two claims jointly.

{¶ 39} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a

reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 40} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 41} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Id.* Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 42} Here, although the murder weapon was not recovered and there was no physical evidence linking appellant to the victim's murder, the state's key witness Erica Campbell, who was with appellant during the evening of the murder, testified at great length as to the events that transpired leading to appellant's shooting of the victim and then burning his body and vehicle. Although appellant raises separate assignments of error, they both contest Campbell's credibility. As such, we review his claims under a manifest-weight standard of review.

{¶ 43} Appellant claims, without specificity, that Campbell's testimony was contradicted by other witnesses. The claim is not borne out by our review of the transcript. Campbell testified that she met appellant at Montgomery's house that evening. After receiving a phone call from Boyd, he asked her to take him to the victim's car lot, where several people, including the victim, had congregated. After she dropped appellant off, she was about to leave when she heard some commotion and saw in her rearview mirror appellant placing the victim in a headlock and punching him.

{¶ 44} Campbell testified that, because of the fighting, others started to leave the car lot. Eventually only appellant and the victim remained at the lot. When the victim was about to leave, appellant closed the gate to the lot. Campbell saw appellant walking toward the victim and then heard gunshots. Appellant ran to her vehicle and got in. She saw him holding a gun, which she had seen him carrying before. Appellant appeared shocked, saying "me and Unc [referring to Boyd] going to fall out about this." Appellant returned to the car lot, turned off the lights of the

victim's van, and then called Montgomery for help. After picking up Montgomery from his house, they stopped at a gas station and appellant had Campbell purchase two pairs of gloves and a gas can and then fill the can with gasoline. They returned to the car lot, and appellant drove the victim's van eventually to Wadena Street, while Campbell and Montgomery followed behind in her vehicle. Once there, appellant got out of the victim's vehicle and poured gas over the vehicle. Campbell then heard a loud boom.

{¶ 45} Our review indicates that Campbell provided a lengthy, coherent, and consistent account of the events on the night of the murder. Her testimony is consistent with other witnesses who testified that a fight broke out between appellant and the victim after appellant arrived at the car lot. Notably, the particulars of her account are corroborated by the testimony of the cellphone records analyst, who testified in great detail regarding his analysis of appellant's and Montgomery's cell phone records. The cell phone location analysis based on phone calls and text messages between appellant and Montgomery revealed appellant's and Montgomery's locations and movement throughout the evening, and they matched Campbell's account of how the events unfolded.

{¶ 46} In addition, Campbell's description of how the victim's vehicle was burned is corroborated by the surveillance video from Wadena Street. The video footage shows a car without its headlights pulled up and it was followed by another car. There was a movement of what appears to be a person toward the first car. Soon afterward, that car exploded, and moments later, the other car left the scene.

{¶ 47} Without any specifics, appellant claims Campbell is untruthful. While we review witness credibility as part of a manifest-weight analysis, we are mindful that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Here, our own review of the trial transcript does not reveal any inconsistency in Campbell's testimony, which is amply corroborated by other evidence presented by the state. After weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we cannot say that the jury, in finding appellant guilty, clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice. The sixth and seventh assignments of error are without merit.

**Prosecutorial Misconduct**

{¶ 48} Under the first assignment of error, appellant alleges several instances of prosecutorial misconduct and argues the cumulative effect of prosecutorial misconduct deprived him of a fair trial. The alleged prosecutorial misconduct relates to (1) the prosecutor's allusion to another shooting incident involving appellant in the opening statement and the introduction of ballistic evidence showing the shell casing found in the instant shooting matched those found in the other incident, and (2) the prosecutor's elicitation of alleged improper victim-impact testimony. We address these two claims in turn.

## a. Prosecutor's Allusion to Another Criminal Incident

{¶ 49} The record reflects that appellant was charged in an unrelated criminal case for a shooting that occurred on August 28, 2017. The state's evidence shows that the 9 mm shell casing found in the victim's burned vehicle matched the shell casings found at the scene in the August 28, 2017 shooting. Before the trial in this case, the state filed a motion for a joint trial, arguing that a joinder of trial was proper because (1) the defendant engaged in similar conduct in both cases in shooting the victim with a firearm, and (2) there was a match between the shell casings found at the crime scenes in these two cases.

{¶ 50} Appellant opposed the joinder, arguing that a joinder was not warranted pursuant to Crim.R. 8(A) because the two incidents did not constitute "parts of a common scheme or plan," were not "part of a course of criminal conduct," and were not based on "the same act or transaction." Appellant also argued a joinder would be highly prejudicial.

{¶ 51} The trial court denied the state's motion to consolidate the two cases for trial. At a hearing before the trial, the defense requested the exclusion of any reference to the other case in the state's opening argument. In response, the trial court instructed that the state's statements at the opening argument should be "consistent with the court's ruling" denying the joinder, but it seemingly

allowed the state to present the ballistic evidence regarding the other case.[1] The court, however, indicated it would provide a limiting instruction regarding the evidence if requested.

{¶ 52} Appellant claims on appeal that the prosecutor engaged in misconduct by informing the jury in the state's opening statement that appellant was linked to another shooting, in violation of the court's ruling denying the state's motion for a joinder. Appellant refers us to the following remark by the prosecutor in the state's opening statement:

> I mentioned earlier that there was a nine-millimeter casing recovered in the engine block of the vehicle. That will be an important piece of information for you.
>
> The reason it will be important is you will hear that casing was submitted through a system called NIBIN, which kind of matches up that casing with any other known casing that has been recovered. And after, there's a match; and that case matches to another incident, and it's associated with another incident with Jerry Sims.

{¶ 53} Appellant claims the prosecutor engaged in further misconduct when the prosecution, despite the court's denial of a joinder, introduced the testimony of Kooser, a firearms examiner, who testified that he was able to determine that the spent casing found in the engine compartment of the burned vehicle matched nine spent casings recovered from a different crime scene in Cleveland; they had been

---

[1] The record reflects that, in response to the request from the defense to exclude the ballistic evidence from the other case, the prosecutor stated the state would "sanitize" as much as possible any mentioning of the other case at the opening argument but it intended to introduce the ballistic evidence from the other case. The trial court, despite its ruling denying the joinder, stated: "Yeah. I think that is as consistent with my ruling as possible. The Court is not in a position to prohibit the state from putting on their case."

fired from the same 9 mm caliber pistol. Appellant claims the ballistic evidence regarding the other case constituted improper other-acts evidence pursuant to Evid.R. 404(B), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

{¶ 54} We note that on appeal appellant does not claim that the trial court erroneously admitted allegedly improper other-acts evidence. Rather, appellant frames his claim in terms of prosecutorial misconduct. Therefore, we apply the standard of review for prosecutorial misconduct to his claim.

{¶ 55} The standard of review for prosecutorial misconduct is whether the actions by the prosecution were improper and, if so, whether they prejudiced a defendant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 56} The state introduced testimony regarding ballistic comparison evidence to show that whoever was involved in the instant case was also involved in another shooting incident — the testimony itself did not directly link appellant to the shell casings found in either shootings but only showed the shell casings were fired from the same firearm. At the opening statement, however, the prosecutor

stated to the jury that the other incident was associated with appellant — despite that appellant had not been convicted in that case.

{¶ 57} While the ballistic comparison evidence may arguably be improper other-acts evidence given the prosecutor's remark at the opening statement, the question is whether the prosecutor's conduct prejudiced appellant's substantial rights. When assessing whether the prosecutor's comment results in prejudice affecting a defendant's substantial rights, we consider factors such as (1) the nature of the remark, (2) whether an objection was made by counsel, (3) whether the court gave curative instructions, and (4) the general strength of the evidence against the defendant. *State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342 (8th Dist.1995).

{¶ 58} Here, although the trial court advised the defense that it would provide a curative instruction to the jury if requested by the defense, the defense did not object or ask for such instruction when the prosecutor alluded to the other case at the opening statement. More importantly, were the ballistic evidence the only evidence implicating appellant in the victim's murder, the prosecutor's remark that appellant was associated with the other shooting may have been highly prejudicial. As we have discussed above, however, the state presented overwhelming, well-corroborated testimonial evidence to prove appellant's guilt at trial. Considering the prosecutor's conduct in the context of the entire trial and balancing the nature of the prosecutor's remark, the lack of objection or request for a curative instruction, and the strength of the evidence against appellant, we do not find the prosecutor's conduct prejudicially affected appellant's substantial rights or denied him a fair trial.

### b. Victim-Impact Testimony

{¶ 59} Appellant also claims the prosecutor engaged in misconduct in eliciting improper victim-impact testimony. "Victim-impact evidence that relates only 'to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family'" is generally inadmissible. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 126, quoting *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

{¶ 60} The pertinent portion of the transcript reflects that the prosecutor asked Michael Smith, a friend of the victim and one of the men who gathered in the car lot on the night of the murder, about his relationship with the victim. Smith testified the victim was like a little brother to him and he had watched him growing up. The prosecutor also asked about the victim's family situation and Smith stated "I know his mom. He had a close family, a church family. Jamarr had just joined the church also." Smith in addition testified that the victim had a son, and that Smith attended the victim's memorial. The defense counsel did not object to the line of questioning.

{¶ 61} Appellant argues on appeal that Smith's testimony about the victim's family situation and his recently joining the church is improper victim-impact testimony and the prosecutor engaged in misconduct in eliciting the testimony. We disagree. Smith's testimony does not appear to relate to the victim's personal characteristics or the emotional impact his murder had on his family. *Clinton* at

¶ 126.  The prosecution did not engage in misconduct eliciting improper victim-impact statement.

{¶ 62} Appellant argues the cumulative effect of prosecutorial misconduct deprived him of a fair trial.  Given the foregoing discussion, we cannot conclude the effect of the claimed misconduct by the prosecutor, cumulative or otherwise, deprived appellant his constitutional right to a fair trial.  The first assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶ 63} Under the second assignment of error, appellant argues the individual and cumulative effect of his trial counsel's errors rendered counsel's performance deficient and denied him his constitutional right to effective assistance of counsel.

{¶ 64} In order to establish a claim of ineffective assistance of counsel, appellant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.  *State v. Iacona*, 93 Ohio St.3d 83, 105, 2001-Ohio-1292, 752 N.E.2d 937.

### a. Alleged Failure to Object to Ballistic Evidence

{¶ 65} Appellant argues his trial counsel was ineffective in failing to object to the state's admission of the ballistic comparison evidence at trial. He raises the claim even though his trial counsel had filed a brief opposing the joinder on the ground of impermissible Evid.R. 404(B) evidence and obtained a favorable ruling from the trial court.

{¶ 66} The record reflects that, after the trial court's ruling denying the state's motion for a joinder, the ballistic evidence was discussed at a side bar in advance of the opening argument and presentation of the state's evidence. The defense counsel continued to object to the ballistic evidence, and the trial court cautioned the state that its opening statement should be consistent with its ruling denying joinder. *State v. Sands*, 11th Dist. Lake No. 2007-L-003, 2008-Ohio-6981, ¶ 126 (appellant's claim that his counsel failed to make contemporaneous objections lacked merit because the testimony objected to was discussed at a side bar ahead of the presentation of testimony; rulings and limitations were made on the record thereby counsel properly preserved the issue for appeal). Appellant's trial counsel did not provide ineffective assistance of counsel in this regard.

### b. Alleged Failure to Object to Other-Weapons Evidence

{¶ 67} Appellant also argues that his trial counsel should have objected to testimony of several witnesses who mentioned that they have seen appellant carrying weapons in light of the fact that all of the weapons the police found on appellant's person when he was arrested had been ruled out as the murder weapon.

{¶ 68} Michael Smith testified that when appellant hit the victim with a wine bottle, he saw appellant with a black gun on his hip. Detective Lundy testified there were several guns found with appellant at the time he was arrested. During his testimony, the seized guns were introduced as evidence. Erica Campbell testified that she had seen appellant carrying guns. She also testified that the detectives had shown her a gun retrieved from appellant when he was arrested and she recognized the gun to be appellant's gun, which he purchased ten days after the murder and she was with him when he purchased the gun. The defense counsel did not object on these occasions.

{¶ 69} Appellant cites *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, in support of his claim. In *Thomas*, the trial court admitted evidence that the defendant possessed a collection of five knives, none of which were related to the knife that was used to stab the victim. The actual knives were introduced as evidence, along with photographs of the knives. The prosecutor described the defendant as an owner of "full Rambo combat knives." *Id.* at ¶ 35. In addition, during closing arguments, the state referred to the collection of knives and held one up to the jury as the prosecutor alluded that the knife was similar to the murder weapon. The plurality opinion in *Thomas* held that that other-weapons evidence, i.e., irrelevant evidence of weapons unrelated to the charges, is inadmissible as it falls within the scope of Evid.R. 404(B), which precludes evidence of other acts "to prove the character of a person in order to show action in conformity therewith." *Id.* at ¶ 35-36. The plurality opinion reversed the defendant's conviction of aggravated

murder under a plain error analysis, concluding that the unrelated weapons evidence was highly prejudicial and there was a reasonable probability that the inadmissible evidence affected the outcome of the trial.

{¶ 70} Pursuant to *Thomas*, the testimony of Campbell and Lundy as well as the introduction of the firearms recovered by the police when appellant was arrested was arguably other-weapons evidence. However, as *Thomas* noted, that "[e]rror in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal." *Id.* at ¶ 38. "Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt." *Id.* at ¶ 39. In other words, whether the alleged error was prejudicial depends on the strength and amount of independent evidence against the defendant. The plurality opinion in *Thomas* found the error to be prejudicial because it found the case against the defendant not to be a case of overwhelming independent evidence of guilt. *Id.* at ¶ 41.[2]

{¶ 71} Here, appellant does not claim the trial court erred in admitting the other-weapons evidence but, rather, his trial counsel provided ineffective assistance in failing to object to the evidence. We note that while *Thomas* reviewed the other-weapons evidence under a plain error analysis, i.e., the accused must demonstrate a

---

[2] The three dissenting justices found that the alleged error in admitting the other-weapons evidence not prejudicial because they found substantial and compelling evidence presented at trial supported the defendant's guilt.

reasonable probability that the error resulted in prejudice, this is the same deferential standard for reviewing ineffective assistance of counsel claims, as the court observed in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{¶ 72} Thus, even if assuming that the other-weapons evidence presented through the testimony of Campbell and Lundy and the admission of firearms seized at the time of appellant's arrest were inadmissible pursuant to *Thomas*, appellant must demonstrate that there is a reasonable probability that the result of the trial would have been different if counsel were to object to the other-weapons evidence. Given the substantial independent evidence supporting appellant's guilt produced by the state, we are unable to reach that conclusion regarding Campbell's and Lundy's testimony and the evidence regarding the seized firearms. *See also State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 79-80 (8th Dist.) (where there was substantial evidence independent of the defendant's guilt, the other-weapons testimony was harmless).

{¶ 73} Smith's testimony, however, is of a different nature. Among the cases cited by the plurality opinion in *Thomas* to support its holding was *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 16 (8th Dist.). Although *Crosby* held that other weapons evidence unrelated to the weapon involved in the offense was not admissible, *Crosby* noted that the court has allowed testimony that the defendant was seen with a gun if the defendant's possession of the gun had a "temporal and spacial proximity" to the crime in question even though the gun seen

was not necessarily the gun involved in the offense. *Id.* at 458, citing *State v. Davis*, 8th Dist. Cuyahoga No. 35421, 1977 Ohio App. LEXIS 7152 (Jan. 6, 1977). *See also State v. Hamilton*, 8th Dist. Cuyahoga No. 97145, 2012-Ohio-1542, ¶ 31.

{¶ 74} Smith testified that he saw appellant with a gun on his hip when he hit the victim with a wine bottle at the car lot, an event that occurred shortly before the victim was shot, according to Campbell's account of the events. Because the testimony shows appellant possessing a gun in close proximity to the murder, both in time and place, this testimony would not be inadmissible other-weapons evidence, pursuant to *Crosby*, *Hamilton*, and *Davis*.

{¶ 75} The second assignment of error is without merit.

**Character Evidence**

{¶ 76} Under the third assignment of error, appellant claims the trial court erred in permitting improper character evidence in violation of Evid.R. 404(A). Under the rule, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" Such evidence is impermissible because, "[a]lthough character is not irrelevant, the danger of prejudice outweighs the probative value of such evidence." *State v. Lytle*, 48 Ohio St.2d 391, 401-402, 358 N.E.2d 623 (1976).

{¶ 77} There is an exception to the rule: "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible[.]" Evid.R. 404(A)(1). "Generally, the state is forbidden from initially introducing evidence of the accused's bad character until the accused presents

evidence of his good character for the purpose of proving conformity with that good character." *State v. English*, 1st Dist. Hamilton No. C-180697, 2020-Ohio-4682, ¶ 42. *See also, e.g., State v. Mitchell*, 1st Dist. Hamilton Nos. C-050416 and C-050417, 2006-Ohio-5073 (the state may not offer evidence of an accused's bad character until the accused offers evidence of his good character or reputation); and *State v. Davis*, 195 Ohio App.3d 123, 2011-Ohio-2387, 958 N.E.2d 1260, ¶ 26 (8th Dist.) (pursuant to Evid.R. 404(A)(1), error will not be found when the defense "opens the door" to otherwise inadmissible evidence). When evidence of character is admissible, "proof may be made by testimony as to reputation or by testimony in the form of an opinion." Evid.R. 405(A).

{¶ 78} For his claim of inadmissible character evidence, appellant refers us to the following portion of Michael Smith's testimony:

> Q. Okay. Have you ever seen these two [referring to appellant and the victim] fight before?
> A. No.
> Q. No. There's been suggestion that these two were like brothers. They fought like brothers constantly. Had you ever seen that?
> A. No. No. No. No. No brothers.
> Q. They were like brothers?
> A. Not at all.
> Q. Why do you say that?
> A. Because I believe Hush [referring to the victim] was more in fear of him due to his reputation.
> Defense Counsel: Objection.
> The Court: Overruled.

{¶ 79} Here, the state elicited testimony in its case in chief that the victim was in fear of appellant due to appellant's reputation. This would appear to be

character evidence, and pursuant to Evid.R. 404(A), it would be inadmissible because appellant did not "open the door" by offering evidence of his character.

{¶ 80} However, assuming without deciding that the testimony was inadmissible, we note that an error in admission pursuant to Evid.R. 404 is subject to the harmless error analysis. *State v. Chambers*, 8th Dist. Cuyahoga No. 99864, 2014-Ohio-390, ¶ 39-40. "[E]rror in the admission of evidence is harmless if there is no reasonable possibility that exclusion of the evidence would have affected the result of the trial." *Id.* at ¶ 44. "[I]t is appropriate to find error harmless where there is 'either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.'" *State v. Drew*, 10th Dist. Franklin No. 07AP-467, 2008-Ohio-2797, ¶ 31, quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5. Given the overwhelming evidence the state presented in this case establishing appellant's guilt, even assuming Smith's testimony constituted improper character evidence, we find the admission harmless beyond a reasonable doubt. The third assignment of error lacks merit.

**Crim.R. 16**

{¶ 81} Under the fourth assignment of error, appellant argues the trial court erred in admitting the Wadena Street surveillance video. He claims the state withheld the evidence from the defense until days before trial in violation of Crim.R. 16 and, therefore, the trial court should have excluded the evidence.

{¶ 82} The record reflects the police had possession of the surveillance video soon after the murder incident. However, the state did not disclose the existence of

the video to the defense until November 1, 2019, three days before the scheduled trial date on November 4. The defense immediately filed a motion in limine. On the scheduled trial date, the state asked for a two-day continuance for both the prosecutor and the defense to view the content of the video. The prosecutor explained that although the state had known about the existence of the video and the law enforcement had viewed the video, the prosecutor's office had not been able to review it because of computer file formatting issues. The prosecutor represented to the court that the BCI, located in Richfield, was currently in possession of the video, the video was now available for viewing, and the prosecutor was about to go to that location to obtain and view the video.

{¶ 83} Although the defense had not viewed the video at that time, it asked the court to exclude the evidence due to the delayed disclosure of its existence. The court granted the state's request for continuance to allow both the prosecutor and the defense to view the content of the video. The court, however, did not rule on the motion in limine. At trial, Special Agent Surgenor testified regarding how the police uncovered the surveillance video, and the video was played for the jury.

{¶ 84} We first note that the evidence at issue is not exculpatory — what the video depicts corroborates the account of the state's witness Campbell. Indeed, appellant does not claim a *Brady* violation. Rather, he claims the state violates Crim.R. 16 and the trial court should have excluded the evidence due to the violation.

{¶ 85} Crim.R. 16 requires the prosecution and defense to disclose evidence to each other. The rule allows the court to impose sanctions for a failure to do so.

The sanctions include an order granting a continuance or prohibiting the party from introducing the material that has not been disclosed. Crim.R. 16(L)(1). Appellant argues the delayed disclosure of the surveillance video was a violation of Crim.R. 16 and the trial court should have excluded the video as a sanction for the discovery violation.

{¶ 86} When a discovery violation occurs, it is within the trial court's discretion to make any order that the court deems just under the circumstances. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. Crim.R. 16(L)((1). *See also State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 20 (8th Dist.) (we review a trial court's sanction for a discovery violation for an abuse of discretion).

{¶ 87} "[P]rosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 131. *See also State v. Lindsey*, 8th Dist. Cuyahoga No. 106111, 2019-Ohio-782, ¶ 48.

{¶ 88} Here, the trial court heard the state's explanations regarding the delay of the disclosure but did not make a finding on whether the state's conduct was willful. Willfulness is "'intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the

likelihood of resulting injury.'" *State v. Bowshier*, 2d Dist. Clark No. 06-CA-41, 2007-Ohio-5364, ¶ 31, quoting *Whitfield v. Dayton*, 167 Ohio App.3d 172, 181, 2006-Ohio- 2917, 854 N.E.2d 532, ¶ 30 (2d Dist.). While the prosecutor's alleged failure to resolve the technical difficulties regarding the video until days before the trial is concerning, our review of the record does not indicate the state acted willfully.

{¶ 89} Regarding the second and third factors, even if we were to agree that the knowledge of the existence of the video and its content, which corroborated the state's witness and could undermine appellant's defense (another person committed the murder), might have potentially aided the defense in preparing for trial, appellant has not demonstrated that his defense was prejudiced by not having the ability to meaningfully review or contest the video disclosed three days before the trial. The trial transcript reflects the defense counsel examined Special Agent Robert Surgenor at great length regarding the surveillance video. Thus, our review shows the evidence was disclosed "in time for its effective use at trial" and the timing of the disclosure did not impair "the fairness of the trial." *State v. White*, 10th Dist. Franklin No. 10AP-34, 2011-Ohio-2364, ¶ 41. The trial court did not abuse its discretion in admitting the surveillance video after ensuring the defense had an opportunity to view it before trial. The fourth assignment of error lacks merit.

**Recusal**

{¶ 90} Under the fifth assignment of error, appellant claims the trial judge presiding over this case should have recused himself from the case because the judge had represented him in four prior cases.

**{¶ 91}** Canon 3(E)(1)(b) of the Code of Judicial Conduct requires a judge to be disqualified if he or she has "served as a lawyer in the matter in controversy." *State v. Smith (In re Berens)*, 117 Ohio St.3d 1235, 2005-Ohio-7155, 884 N.E.2d 1088, ¶ 4. Moreover, "[p]rior representation of a party by a judge * * * on matters wholly unrelated to matters presently pending before the judge does not mandate judicial disqualification, absent a specific showing of actual bias on the part of the judge." *In re Disqualification of Rothgery*, 110 Ohio St.3d 1216, 1216, 2005-Ohio-7152, 885 N.E.2d 245. "[T]he prevalent American rule of disqualification is limited to instances in which the judge participated as a lawyer in an earlier stage of the same case. Under this majority rule, unless there is a specific showing of bias, a judge is not disqualified merely because he or she worked as a lawyer for or against a party in a previous, unrelated matter." *Smith* at ¶ 5, quoting *Mustafoski v. State*, 867 P.2d 824, 832 (Alaska App.1994). "A judge in a criminal case is not required to disqualify himself simply because he may have previously represented the defendant in some unrelated matter." *Id.,* quoting *Kilgore v. Maass*, 89 Ore. App. 489, 492, 749 P.2d 1201 (1988). However, a judge should "uphold and promote the independence, integrity, and impartiality of the judiciary" and avoid "the appearance of impropriety." Canon 1 of the Code of Judicial Conduct.

**{¶ 92}** Here, the trial judge presiding over the trial had represented appellant as counsel or co-counsel in four prior criminal cases in 2006 and 2007. Aware of the potential appearance of conflict, the judge addressed this issue in open court prior to the trial and made a record of the discussion on this issue. The trial

judge stated that his representation of appellant occurred 12 years ago and he did not remember much about the cases and he did not believe there was a conflict. Appellant stated he did not remember being represented by the trial judge in the prior cases.[3] An attorney who was co-counsel with the trial judge in one of the prior cases was present at this hearing and he represented to the trial judge that he had talked to appellant and appellant "has no problems with [the trial judge] going forward handling this case."  Appellant's counsel in this case also indicated on the record that counsel did not perceive a conflict and had no objections.

{¶ 93} In *Smith*, the court found no grounds for disqualification, noting that the trial judge did not represent the defendant in the matter now in controversy before the judge and the judge professed to have no recollection of the defendant in the earlier case.  Similarly here, the prior cases were unrelated to the instant matter and there was a long lapse of time between the trial court's representation of appellant and the instant trial such that neither remember the prior representations well.  As such, our reading of the pertinent portion of the transcript does not reflect any bias or prejudice on the part of the trial court against appellant.

{¶ 94} In any event, we note that even if a disqualification of the trial court is warranted due to bias or prejudice, an appellate court is without authority to pass on issues of disqualification or to void a judgment on the ground that a judge should

---

[3] Appellant stated, "I had Greg Robey [as my attorney]. I don't [sic] never seen you or anything.  I don't remember ever seeing you period. I had Greg Robey."

be disqualified. *State v. Donald*, 7th Dist. Mahoning No. 09 MA 172, 2011-Ohio-3400, citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978). When claiming bias or prejudice on the part of the trial court, a defendant's remedy is to file an affidavit of disqualification for prejudice with the clerk of the Supreme Court pursuant to R.C. 2701.03. *State v. Hussein*, 10th Dist. Franklin No. 15AP-1093, 2017-Ohio-5519, ¶ 9. The fifth assignment of error lacks merit.

**Cumulative Effect of Errors**

{¶ 95} Under the eighth assignment of error, appellant claims the cumulative effect of the trial errors deprived him of his right to a fair trial. Under the doctrine of cumulative errors, a conviction will be reversed when the cumulative effect of trial errors deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Multiple errors that are separately harmless may, when considered together, violate a person's right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. When considering a claim that the cumulative errors deprives the defendant a fair trial, we are reminded that "'"[t]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial."'" *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 82 (8th Dist.), quoting *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). As we have discussed above, while we found several potential errors, none

of them are prejudicial.  Even considering the potential prejudicial effect of these potential errors cumulatively, our review of the entire trial indicates appellant received a fair trial and the cumulative-error principle does not apply to justify a reversal of appellant's conviction.  The eighth assignment of error lacks merit.

{¶ 96}  Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EILEEN T. GALLAGHER, J., CONCUR